United States District Court
Southern District of Texas
**ENTERED**

March 28, 2023

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT GENE WILL, II, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 15-CV-3474 |
| | § | |
| BOBBY LUMPKIN, Director, Texas | § | |
| Department of Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

This Court has a long history with this case. Will filed his initial federal petition well over a decade ago. Throughout the years, the Court has considered various—and evolving—challenges to Will's conviction. This Court has presided over hearings which have questioned the trial representation Will received and the integrity of the evidence showing his guilt. As time has passed, Will has poked more and more holes in the case that the State presented at trial. This Court has previously expressed deep misgivings about the state of the evidence and given voice to weighty concerns about Will's conviction. This Court has "lament[ed] the strict limitations placed upon it" by federal habeas law in light of the "disturbing uncertainties," "total absence of eyewitness testimony or strongly probative forensic evidence," and "considerable evidence supporting Will's innocence." *Will v. Thaler*, No. H-07-CV-1000, Docket Entry No. 88 at 19-20 (S.D. Tex. Jan. 17, 2012).

The petition now before the Court renews a theme that has persisted since early days: that Michael Rosario was the one who shot the victim, Harris County Sheriff's Deputy Barrett Hill. Unlike previous legal arguments, however, this theory is now embedded in a

constitutional challenge involving the suppression of evidence. In this petition, Will contends that the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by not disclosing two documents which implicate Rosario as the true killer.

The merits of Will's *Brady* claim are not before the Court in the current procedural posture. The question at issue is whether the Anti-Terrorism and Effective Death Penalty Act (AEDPA) will allow Will's successive petition containing the *Brady* claim to proceed. As the Court discusses below, Will has met the legal standards which will allow his *Brady* claim to be heard. The Court will also address the pending motions in this case.

<u>**Background**</u>

Judicial opinions have repeatedly told the story of Deputy Hill's murder.[1] With robust factual discussions already provided elsewhere, the Court now gives only a concise summary of the crime which led to Will's capital conviction. In doing so, the Court recognizes that, while "the record is not devoid of evidence supporting Will's conviction," it also "reflects anything but a slam dunk." *In re Will*, 970 F.3d 536, 546 (5th Cir. 2020). The jury considering the charges against Will certainly had sufficient evidence to find him guilty beyond a reasonable doubt, but time has proven that the "evidence establishing Will's guilt is assailable." *Id*. at 546.

**I.      The Murder**

At around 6:30 a.m. on December 4, 2000, police received a report of men breaking into a vehicle at an apartment complex. When Deputy Hill and his training officer, Deputy Warren Kelly, responded to the call, they found two men standing outside. The men

---

[1]      For example, the trial court provided a detailed and extensive review of the crime which resulted in Will's capital-murder conviction when considering his successive state habeas application. (Docket Entry No. 37, Exh. 39 at 3-14).

appeared to be removing parts from vehicles.  As Deputy Kelly pulled the police cruiser up to them, the men ran in different directions.  Deputy Hill chased one man now known to be Will.  Deputy Kelly called for backup as he chased the other man—now known to be Michael Alan Rosario—in the opposite direction.  A few moments later, Deputy Hill lay dying from gunshot wounds.

No one witnessed the murder of Deputy Hill.  Since his death, both the State and the attorneys representing Will have examined the minutia of the moments surrounding the event, finding clues as to who fired the killing shots.  As time has progressed, so have the challenges Will has made to the timeline of events propounded by the State at trial.  Tracing the history of those challenges leads to the claim in Will's most-recent habeas petition.

## II.    The Trial

The Fifth Circuit recently placed the trial evidence into two categories: evidence which supported Will's guilt and that which raised reasonable doubt.  *Will*, 970 F.3d at 544-46.[2]  This Court will likewise consider first the evidence of guilt before turning to the evidence supporting the defense.

Strong evidence pointed to Will as the killer.  The two police officers chased the men in opposite directions.  Not long after giving chase, Deputy Hill announced over the radio: "I've got one, in custody."  A minute later, the suspect (Rosario) that Deputy Kelly had been chasing disappeared around a tree.  When Deputy Kelly lost sight of Rosario, he was running in the direction away from Deputy Hill.  Deputy Kelly then radioed that he "lost him on the bayou[.]"

---

[2]      Will stood trial in 2002 in the 185th District Court for Harris County, Texas with the Honorable Susan Baetz Brown presiding.  Assistant District Attorneys Lynne Parsons and Denise Nassar represented the State at trial.  Anthony Osso and David Cunningham represented Will.

Eight seconds later, gunshots sounded over the radio. Deputy Kelly heard between five and seven gunshots. The police radio broadcasted gasping sounds. Soon after hearing the gunshots, Deputy Kelly saw Will run from the area.

Deputy Kelly tried to find his partner. When other units arrived, they joined in the search. It took about half an hour to find Deputy Hill's body. A medical examiner testified at trial that Deputy Hill's injuries was consistent with gunshots fired from above. The police found handcuffs on the ground but the keys still on Deputy Hill's body. Will's blood was on Deputy Hill's right boot.

Respondent has summarized how the State wove that narrative into a case for Will's guilt:

> The prosecution's theory at trial was that Hill had Will on the ground, and in a moment of vulnerability when Hill went to get his handcuffs, Will fired his gun at Hill from the ground. Having accidentally shot his left hand in the process, Will's blood dripped onto Hill's boot, as Will towered over Hill's body on the ground to fire the three final (and fatal) shots.

(Docket Entry No. 42 at 63).

The prosecution supported this theory with testimony describing events after the murder. A woman named Cassandra Simmons testified that a man stole her car at gunpoint soon after the shooting. Ms. Simmons identified that man as Will. She testified at trial that Will had said: "I just shot a policeman."

When police eventually apprehended Will in Ms. Simmons' car (with different license plates) several hours later, he had the murder weapon in his waistband. The police found gunshot residue on Will's left hand and on a glove in the car. He had a wound on his left hand from the same gun that had killed Deputy Kelly. Will's clothing appeared to have been stained by bleach.

But, as noted by the Fifth Circuit, not all the evidence pointed toward Will's guilt. The circumstances of the murder raised serious questions that do not have easy answers. Deputy Kelly had lost sight of Rosario before the shooting.  No one could account for Rosario's actions for a brief period afterwards.  Deputy Kelly was initially wrong about which direction he saw Rosario running.  Police found Rosario's jacket and pants around 700 feet to the east of Deputy Hill's body.

Before shots rang out, Deputy Hill had reported that he had "the tall one . . . in custody"—apparently meaning that Will was handcuffed or otherwise under police control. All along, the defense has argued that it would have been difficult for Will to have shot Deputy Hill while "in custody."

Circumstantial evidence which pointed to Will's guilt was not unassailable. Ms. Simmons reported that Will claimed to have shot a policeman, but she did not tell the prosecution that story until thirteen months after the murder.  No forensic evidence concretely established how Deputy Hill had been shot.  The medical examiner could not say with certainty how Deputy Hill had been shot or how many shots were fired.  Forensic evidence was possibly consistent with Deputy Hill being shot from behind while handcuffing Will. All the gunshots were fired from more than two feet away.

A police photographer could not remember if the handcuffs were open or closed when he approached the scene.  Will's blood on Deputy Hill's boot was not conclusive evidence of guilt—it could have landed there when Will was shot in the hand.  The police could not find any of Deputy Hill's blood on Will.  Evidence about bleach was not irrefutable, particularly because the police never tested Will's clothes for chemicals.

Weaknesses in the State's case were not lost on Will's trial attorneys.  In addition to pointing out many deficiencies in the evidence, Will's trial attorneys crafted a defense that pinned the murder on Rosario.  Will's trial arguments for innocence focused on the evidentiary blackout period from when Deputy Kelly lost sight of Rosario to when gunshots rang out.  Will argued that this time—which he then gauged to be eighty-seven seconds—was sufficient for Rosario to have committed the murder.  Tr. Vol. 26 at 118-19.[3]  Will interpreted available evidence in a manner which would place Rosario in proximity to the killing.  Will argued that he could not have shot Deputy Hill if restrained and in custody.  Will has also challenged forensic evidence including the gunshot residue found on one of his hands and the blood found on various items.[4]  Will tried to undercut Ms. Simmons' testimony because she did not tell the police officers about Will's statements until soon before trial. Tr. Vol. 25 at 205-07; Tr. Vol. 26 at 73-76, 91-104.  Importantly, Will argued that Rosario's statements and actions after the murder showed evidence of his guilt.  For example, Rosario's girlfriend said he was nervous soon after the murder.  Rosario told her "not to say anything to the cops about him because they could trace it back to what *him* and [Will] have done."  Tr. Vol. 25 at 180-6, 193, 199.

"As the centerpiece of Will's defense, Harris County Jail inmate Victor Coronado testified that Rosario confessed to him."  *Will v. Thaler*, 2011 WL 864799, at *2 (S.D. Tex.

---

[3]     At trial, the State argued that Rosario only had eight seconds to circle around to where Will was "in custody."  Tr. Vo. 26 at 115-20.  Respondent now states that "[t]he most straightforward interpretation of Kelly's account suggests Rosario had about fo[]rty-four seconds to make it across the field to Hill and shoot him."  (Docket Entry No. 42 at 58).

[4]     Tr. Vol. 24 at 114-118 (the only gunshot residue found on Will was a result of his gunshot wound, not firing a gun); Tr. Vol. 24 at 31 (no blood from Deputy Hill was found on Will); Tr. Vol. 24 at 24-25, 32, 35-36 (only a single, small spot of Will's blood was found on Deputy Hill).

2011).[5]  Rosario allegedly told Coronado that "he had no choice but to shoot the cop," but it was "just instinct."  Rosario allegedly told Coronado that he used "a big .40, .40 mag," and there "was nothing anybody could do to him" because Rosario's father was a police officer.  Tr. Vol. 26 at 5-14.  The prosecution did not present any direct evidence that Coronado had manufactured this story, but nevertheless strongly questioned his credibility.

Despite questions raised by the trial evidence, the jury found Will guilty of capital murder.  He received a death sentence in a separate punishment hearing.

## III.    Post-Trial Developments

Throughout the years, Will has repeatedly recast the trial evidence using many of the same themes from trial, supported by evidence of various levels of credibility. Will has intensively analyzed each moment from when the police arrived until the two men fled, proposing different versions of what could have happened. Taken together, however, all Will's challenges follow the basic themes developed for trial, even if they rely on different interpretations of the trial evidence or new evidentiary information.  Throughout the post-conviction process, Will's challenges have centered on one consistent refrain: Rosario was the true killer.

Will's attribution of the crime to Rosario has depended on his interpretation of physical evidence and the testimony of those to whom Rosario allegedly confessed.  Over the years, Will's case has evolved, with his theory of how the murder happened pivoting as new witnesses came forward or new evidence developed.  Yet Will has woven the consistent thread of Rosario's alleged admissions into an unsettling tapestry of evidence.

---

[5]    Trial counsel's opening argument asserted: "Ultimately in jail, although he has not been candid with law enforcement, Mr. Rosario brags to those people around him, brags about the killing and tells them facts that only the killer would know."  Tr. Vol. 17 at 43.

Will based his first federal petition on affidavits he secured from three inmates—Antonio Riojas, Rene Gonzales, and Richard Lucio—each of whom said that, while they were incarcerated with Rosario, he confessed to committing the murder.  Will subsequently filed a Motion to Alter or Amend pursuant to Rule 59(e) of the Federal Rules of Civil Procedure (Docket Entry No. 46, 47) based on an affidavit from his former girlfriend Brenda Venegas.  Venegas related statements Rosario allegedly made soon after the murder.  *Will v. Thaler*, 2012 WL 135590 at *6-7 (S.D. Tex. 2012).  But none of those witnesses was credible.  The testimony from inmates and Venegas did not provide a basis for habeas relief.[6]

## IV.    2013 Successive State Habeas Application

In 2013, Will began a new state-court challenge which has led to the instant petition.  (*Will v. Davis*, 4:07-cv-1000, Docket Entry Nos. 135-36).  The pleadings Will filed in state court have led to the instant federal petition.  Will's application in the Texas Court of Criminal Appeals raised three claims: (1) actual-innocence; (2) the suppression of

---

[6]       A**Error! Main Document Only.**fter the appointment of new federal counsel, Will filed an Emergency Motion for Relief asking the Court to vacate its judgment and prior orders pursuant to Federal Rule of Civil Procedure 60(b).  (Docket Entry No. 102).  Will's motion made two arguments: (1) that Will's state habeas counsel provided inadequate representation; and (2) that Will's previous attorneys, both in state and federal court, failed to advance certain arguments that would inculpate Rosario.  The motion, however, raised a new claim by arguing that trial counsel should have presented inconsistent statements by Rosario to the jury and examined forensic evidence on Will's jacket.  Will based his ineffective-assistance-of-habeas-counsel claim on *Martinez v. Ryan*, a case pending before the United States Supreme Court.  On March 19, 2012, the Court dismissed Will's motion for want of jurisdiction.  (Docket Entry No. 106).  The Court found that Will's Rule 60(b) Motion was a successive petition for which it had not authority to consider.  Will filed a Notice of Appeal that same day.  (Docket Entry No. 107).  On March 20, 2012, the Supreme Court issued an opinion in *Martinez v. Ryan*, 566 U.S. 1 (2012).  The Fifth Circuit entered an order remanding Will's case to allow consideration of the *Martinez* ruling.  This Court reopened the case for consideration of Will's *Martinez* arguments.  (Docket Entry 140).  The Court denied Rule 60(b) relief on September 26, 2018.  (Docket Entry No. 163).  Will did not directly appeal this Court's determination regarding the first two claims in his federal petition.  Instead, Will's appeal focused on whether this Court erred by finding that his Rule 60(b) motion based on *Martinez* constituted a successive federal petition.  In an opinion that did not need to reach this Court's decisions about the credibility or reliability of the three inmate witnesses or Venegas, the Fifth Circuit affirmed.  *Will v. Lumpkin*, 978 F.3d 933 (5th Cir. 2020).

material evidence; and (3) alternatively, trial counsel should have uncovered the documents allegedly suppressed by the State. (Docket No. 57, Ex. 71 at 2-3).

Will's *Brady* claim primarily centered on the suppression of two pieces of evidence referred to as the Hit Document and Schifani Report.   Will has summarized these documents as follows:

> The first was a Harris County Sheriff's Office document, which reveals that the county jail was holding Michael Rosario in a separate section of the Harris County Jail because Rosario had asked a prison gang to kill Rob Will. See Ex.1, Michael Rosario Administrative Separation Review Sheet ("Hit Document"), at 1. Specifically, Rosario's "Administrative Separation Review Sheet" states that Rosario's "Reason For Separation" was that Rosario was "soliciting [the Texas Syndicate prison gang] to make [a] hit on co-def. Robt. Will." *See id.* The Hit Document also indicates that contact was made "w[ith] [the Disruptive Group Unit] to visit w[ith] David Cruz [Texas Syndicate]." *Id.* Copies of Mr. Cruz's undisclosed jail records found in the District Attorney's case file show that the State knew of his connection to Rob Will's case before trial. Compare Ex. 6, David Cruz Administrative Separation Review Sheet Updated 2-10- 01, at 1, with Ex. 5, David Cruz Administrative Separation Review Sheet Last Updated 4-27- 01, at 1.

> A second document never disclosed to Mr. Will's defense counsel was a report by Harris County Sheriff's Deputy Patricia Schifani. *See* Ex. 7, Report of Deputy Patricia Schifani ("Schifani Report"). According to her report, Deputy Schifani was returning Harris County jail inmates, including Michael Rosario, from court on December 7, 2000, three days after the murder.

> Rosario looked directly at the mourning badge cover that Deputy Schifani had been wearing in honor of Deputy Hill and said, "Do you know why you are wearing that? . . . I am part of the reason you are wearing it, do you know who I am?" *Id.* Rosario, the son of a Houston Police Department officer, then "pointed at his armband caution text which indicated '*PROTECTION*'" and said, "I'm high-profile! Do you know who my father is?" *Id.*

(Docket No. 37 at 3).

Will fit the allegedly suppressed evidence into a broader narrative about the murder, most of which echoes his earlier allegations.   Independent of the Hit Document and

Schifani Report which the State had allegedly suppressed, Will's state habeas application

also relied on the following new evidence to show his innocence:

- *K-9 Report-* Shortly after the murder a K-9 Unit bloodhound picked up a scent from the tool bags that Will and Rosario used before the police foot chase.  Will argued that a report detailing the two tracks taken by the bloodhound followed a path which Will allegedly never took, but could place Rosario near the killing. (Docket No. 57, Ex. 71 at 15).  Will did not allege that the State suppressed the K-9 report.

- *New Timetable-* At trial, and in all the proceedings since, the parties have debated the timing of events surrounding the murder.  At trial, the prosecution argued Rosario had only eight seconds to reach and shoot Hill.  The defense argued that he had eighty-seven seconds to do so.  Tr. Vol. 26 at 115-20.  Using the trial testimony, Will recalculated the time as being between 26 and 104 seconds in which Rosario could have reached where the murder occurred. (Docket No. 57, Ex. 71 at 17).

- *Forensic Evidence-* Will reassessed the forensic evidence in an effort to pin the murder on Rosario.  Specifically, Will looked at (1) the gunshot wound to the back of Hill's head; (2) a reassessment of Will's evolving stories about how he was freed from handcuffs; (3) gunshot residue detected on Will's left-hand glove (but not his right); and (4) blood from which DNA could not be extracted on clothing abandoned around 700 feet east of Hill's body. (Docket No. 57, Ex. 71 at 19-22).

- *Rosario's Actions After the Murder-* Will readdressed Rosario's actions after the murder and alleges that they indicate his guilt.  (Docket No. 57, Ex. 71 at 22-23).

- *Ms. Simmons' Testimony-* Will alleged that Ms. Simmons did not say he had confessed to the murder until long after the crime.  (Docket No. 57, Ex. 71 at 23-25).  In state habeas court, Will based this argument on an affidavit in which Ms. Simmons' boyfriend explained that the police had shown her gruesome photographs of the victim's body.  While the connection between that undisclosed information and her trial testimony is somewhat unclear, Will apparently speculated that the reaction to the photographs caused her to invent a story that he had confessed when he stole her car.[7]

---

[7]        Will claimed that Cassandra Simmons, the witness who testified at trial that Will told her "he had just shot a policeman," did not tell that to the police initially.  Will claimed that the prosecution did not divulge that, on the eve of trial, it showed Ms. Simmons "very gruesome and extremely graphic" photographs of the slain victim.  (Docket No. 57, Ex. 71 at 25).  Will claimed that the photos "no doubt biased her testimony, causing her to recount a statement that, the evidence shows, was not part of her actual recollection of the events." (Docket No. 57, Ex. 71 at 25).  As discussed below, the parties dispute whether the suppression of the evidence that the police had shown these photographs to Ms. Simmons is properly encompassed within

On February 5, 2014, the Court of Criminal Appeals entered an order remanding the subsequent state habeas application.  The trial-level habeas court considered Will's evidence without holding an evidentiary hearing.  On January 26, 2015, the trial court entered a 49-page-long recommendation containing explicit findings of fact and conclusions of law.  (Docket No. 57, Ex. 74 at 701-49).  The trial-court findings addressed Will's new evidence and considered its effect in the larger context of all the record evidence.  On that basis, the trial-level habeas court recommended that relief be denied.

The Court of Criminal Appeals reviewed the record and, on November 25, 2015, adopted the lower court's findings with limited exceptions.  *Ex parte Will*, WR-63,590-03 (Tex. Crim. App. Nov. 25, 2015); Docket Entry No. 37, Ex. 38.

## V.   Will's Successive Federal Petition

On November 27, 2015, Will filed a federal petition which mirrored his successive state habeas application.  (Docket Entry No. 1).  Will's 2015 petition raised three grounds for relief: (1) his actual innocence should forgive any procedural impediments to federal review and offer an actionable basis for habeas relief; (2) the State violated his constitutional rights under *Brady*; and (3) alternatively, trial counsel provided constitutionally deficient representation by not discovering the material on which Will bases his *Brady* claim.  Will premised all three claims on evidence that the State allegedly did not provide to the defense before trial.

AEDPA generally anticipates a "one bite at the post-conviction apple" approach to federal habeas review.  *United States v. Barrett*, 178 F.3d 34, 57 (1st Cir. 1997).  AEDPA

---

the scope of Will's *Brady* claim. The state habeas court considered this allegedly suppressed evidence as a component of Will's *Brady* claim.

protects against abuse of the habeas writ by mandating that, "if the prisoner asserts a claim that was not presented in a previous petition, the claim must be dismissed unless it falls within one of two narrow exceptions." *Tyler v. Cain*, 533 U.S. 656, 661 (2001).

Before his successive action will continue, an inmate must prove:

(1)     the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(2)     the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(B).

An inmate wishing to file a successive federal petition "must get through two gates before the merits of the motion can be considered." *Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001) (quoting *Bennett v. United States*, 119 F.3d 468, 470 (7th Cir. 1997). As the "first gate," AEDPA established a pre-authorization procedure where an inmate must first seek approval for filing from a three-judge panel of the circuit court. *See* 28 U.S.C. § 2244(3). The circuit court assesses whether to allow the filing of a successive petition in the lower court. *Reyes-Requena*, 243 F.3d at 899. A circuit court preliminarily authorizes the filing of a successive action if a petitioner shows that it is "reasonably likely" that his successive petition meets section 2244(b)'s "stringent requirements." *In re Morris*, 328 F.3d 739, 740 (5th Cir. 2003).

On September 25, 2017, this Court transferred Will's successive federal petition to the Fifth Circuit. (Docket Entry No. 20). There, Will abandoned the ineffective-assistance-of-counsel claim he had raised before this Court. Will instead seeks authorization to file two claims in the district court: (1) that "the State violated his due

process rights under *Brady v. Maryland* by withholding material exculpatory evidence";
and (2) that "his conviction and death sentence and continued incarceration violate his
Eighth and Fourteenth Amendment rights because he is actually innocent." Brief Of
Petitioner-Appellant Robert Gene Will, II and Motion for an Order Authorizing Filing and
Consideration of Second Petition, *In re Will*, 17-70022, at 26.

The Fifth Circuit found that Will passed through the first gate by making "a prima
facie showing that his *Brady* claim was not previously presented, that the evidence could
not have been discovered through due diligence, and that his claim has merit[.]" *Will*, 970
F.3d at 548.  On August 5, 2020, the Fifth Circuit entered an order authorizing Will to file
a successive petition in the district court:

> Based on the probative value of the previously withheld evidence, Will has
> made a sufficient showing to proceed to a fuller review.  He's demonstrated
> it is reasonably likely that, after hearing the new evidence alongside the old
> evidence, every reasonable juror would have some level of reasonable
> doubt.  We express no view on whether Will should ultimately prevail on
> the merits or whether he is actually innocent.  We hold only that Will has
> made a prima facie showing that his *Brady* claim deserves fuller
> consideration.  He may be right.  He may be wrong.  But he should be heard.

*Id*. at 547-48 (footnotes omitted).

## VI.    District Court Proceedings

On December 9, 2020, Will filed an amended petition in this Court.  (Docket Entry
No. 37).  Respondent moved to dismiss.  (Docket Entry No. 42).  Respondent argued that
Will had not shown that his claims could pass through the second AEDPA gateway to a
merits review.  On the same day he filed a response to the motion to dismiss, Will moved
for discovery and an evidentiary hearing.  (Docket Entry Nos. 59, 60).

On September 20, 2022, the Court entered an Order denying the motion to dismiss
subject to *sua sponte* reconsideration.  (Docket Entry No. 67).  The Court needed additional

briefing from the parties before deciding whether Will's successive petition may proceed to adjudication.  The parties have responded to the court-ordered briefing.  (Docket Entry Nos. 73, 74, 75, and 77).  The question of whether Will has met the standards for successive habeas review is ripe.

## VII.    Evidence Developed on Federal Habeas Review

Before turning to the question of AEDPA's successive-petition review, the Court pauses to comment on evidence which has come to light only recently.  After the Fifth Circuit remanded this case, the State disclosed many documents that it had withheld from the defense for over two decades.  On January 6, 2022, Will's current attorneys requested another review of the Harris County District Attorney's case file.  After reviewing the files, the District Attorney's Office revealed a document which had been withheld as "work product."[8]  On June 23, 2022, the State turned over 250 pages of documents which had never been seen by the defense despite earlier attempts to see the State's full file.

In his opposed motion for discovery (Docket Entry No. 59), Will outlines material which the State turned over to him only recently:

1.    A note in which a police officer recounted his encounter with Rosario at the scene the morning of Deputy Hill's murder.  Rosario told the officer that his "dad is HPD."

2.    Typewritten notes of an interview with a maintenance man at the apartment where Will lived with his girlfriend, Venegas.  The maintenance man reported that Venegas said that "she was not sure if Robert had killed the deputy because Rosario had blood on his clothes and had washed them at her apartment that same morning."

---

[8]        The work-product doctrine protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative [] including the other party's attorney . . . ."  Fed. R. Civ. P. 26(b)(3).  "The privilege derived from the work-product doctrine is not absolute."  *United States v. Nobles*, 422 U.S. 225, 239 (1975).  "Because *Brady* is based on the Constitution, it overrides court-made rules of procedure.  Thus, the work-product immunity for discovery . . . prohibits discovery . . . but it does not alter the prosecutor's duty to disclose material that is within *Brady*."  *See* 2 Charles Alan Wright, Federal Practice and Procedure § 254.2 (3d ed. 2000); *see also Dickson v. Quarterman*, 462 F.3d 470, 479 n.7 (5th Cir. 2006).

3.    An affidavit from the maintenance man which mentions that law enforcement had interviewed him after the murder but omits mention of his conversation with Venegas

4.    An email exchange between the lead prosecutor and a police officer. The email indicates that the officer had spoken with Will's trial counsel. The email says: "Will has reported that he has had several meetings with Stricklin [sic] in the jail. Will has told his lawyer that Stricklin [sic] has asked him about the shooting and his actions at the shooting. Will is sticking with the story that Rosario is the shooter. Ms. Parsons knew Deputy Strickland had spoken with several inmates about Rosario."

5.    A handwritten note labeled "Stricklin" which indicates that a prosecutor spoke with Deputy Strickland and knew that he had interviewed four inmates about Rosario, not two like she said in open court. It also indicates that the prosecution was aware that the defense only knew about two of the inmates. The note allegedly indicates that the prosecution took seriously the possibility of Rosario ordering a hit.

6.    A handwritten note with "Rene Gonzalez" at the top allegedly indicating that Will asked Gonzales to tell law enforcement about the hit.

7.    A handwritten note indicating that Texas Syndicate members confirmed that Rosario had put a hit on Will because Will accused him of being the shooter.

(Docket Entry No. 59 at 10-18). The parties also debate whether these new revelations merely supplement the *Brady* claim in Will's successive petition or whether they give rise to entirely new *Brady* claims.[9]

This Court has elsewhere noted concerns about the Harris County District Attorney's Office using the "work-product doctrine . . . to hide relevant and exculpatory information from the defense." *Prible v. Davis*, 2020 WL 2563544, at n.21 (S.D. Tex. 2020), *vacated sub nom. Prible v. Lumpkin*, 43 F.4th 501 (5th Cir. 2022). Respondent has

---

[9]    Will has not yet asked the Court to allow a return to state court to exhaust any issues relating to this new information.

not explained why this information was withheld from Will for decades.  It appears that the newly disclosed material could have been helpful to Will at trial and during his later post-conviction state-court litigation.  Will wants discovery related to these belated disclosures by the State.

## Second Gatekeeper Review Standard

The law is clear that the first gateway made by the circuit court is a prima facie inquiry subject only to threshold consideration.  Congress gave the circuit courts only a short timeline for their initial-gatekeeper review, 28 U.S.C. § 2244(b)(3)(D) ("30 days"), which limits the circuit court review in various ways.  For example, the abbreviated timeline means the circuit decision likely will not rest on a full review of the state court record.  *See In re McDonald*, 514 F.3d 539, 543 (6th Cir. 2008) ("When considering motions pursuant to 28 U.S.C. § 2244(b) for permission to file a second or successive habeas corpus petition, the court does not have a developed record because the new petition has not yet been considered by a district court.").  As one circuit has observed:

> The typical authorization proceeding is an *ex parte* matter, with little if any factual record, that is to be decided—conclusively, if denied—in thirty days.  These parameters indicate a streamlined procedure with a narrow focus on a fixed set of pre-specified and easily assessed criteria, which would be disrupted by engaging the manifold merits issues raised by potentially complex, fact-bound constitutional claims.

*Ochoa v. Sirmons,* 485 F.3d 538, 542 (10th Cir. 2007).

The circuit court's brief examination precludes a deep-dive into the merits of habeas claims.  The circuit court's review only looks to whether an inmate has made a prima facie showing of compliance with section 2244(b)(3)(A).  *See* 28 U.S.C. § 2244(b)(3)(C) ("The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the

application satisfies the requirements of this subsection.").  Thus, the circuit court's determination is "tentative"—it is only a prima facie assessment of a matter which a district court must conclusively decide.  *Reyes-Requena*, 243 F.3d at 899 (5th Cir. 2001) (quoting *Bennett*, 119 F.3d at 469).

AEDPA makes the district court a "second-gatekeeper" that "conduct[s] a 'thorough' review to determine if the [petition] 'conclusively' demonstrates that it does not meet AEDPA's second or successive motion requirements."  *Reyes-Requena*, 243 F.3d at 898-99 (quoting *United States v. Villa-Gonzalez*, 208 F.3d 1160, 1165 (9th Cir. 2000)); *see* 28 U.S.C. § 2244(b)(4).  The Fifth Circuit's *prima facie* decision carries no weight; the district court must "decide the § 2244(b)(1) & (2) issues fresh, or in the legal vernacular, de novo."  *Jordan v. Secretary, Dep't of Corrections*, 485 F.3d 1351, 1358 (11th Cir. 2007).

A district court's duty is deeper and more pointed than the circuit court's prima facie review.  "A district court *shall* dismiss any claim" in a successive petition "*unless* the applicant shows that the claim satisfies the requirements of this section."  28 U.S.C. § 2244(b)(4) (emphasis added).  This Court's focus is on whether Will has met his burden under the section 2244(b)(2).

## Analysis

### I.    Issues Available For Review

Under AEDPA's plain language, a circuit court preliminarily authorizes the filing of an "application," not of individual claims.  28 U.S.C. § 2244(b)(3).  Taken broadly, Will's petition raises two claims: a substantive claim of actual innocence and a *Brady* claim.  In contrast with the circuit court's role, this Court's review is not on whether Will's

whole petition should qualify for successive review.  This Court must examine whether each claim warrants additional consideration.  *See* 28 U.S.C. § 2244(b)(4).

 Will's substantive actual-innocence claim does not pass through the second gateway to further review.  "Actual innocence" is not an independent ground for habeas corpus relief.  *See Herrera v. Collins*, 506 U.S. 390, 400 (1993); *In re Raby*, 925 F.3d 749, 755 (5th Cir. 2019); *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006). Insofar as Will argues that his actual innocence entitles him to relief separate from any other constitutional issue, he does not raise a cognizable habeas claim.

The Court must decide the contours of the *Brady* claim Will raises on successive federal review.  The parties debate whether Will's *Brady* claim properly encompasses the alleged suppression of evidence related to Ms. Simmons's testimony.  Specifically, Respondent contends that Will failed to raise properly the argument that the State unlawfully failed to disclose that prosecutors showed Ms. Simmons graphic photographs of Deputy Hill's body just before she testified about Will's statement.

Respondent's argument lacks merit. Will has raised this argument consistently in his briefing.  *See* Docket Entry No. 1 at 10, 20-22 (Original Petition); Docket Entry No. 37 at 22, 33-35 (Amended Petition); Brief Of Petitioner-Appellant Robert Gene Will, II and Motion for an Order Authorizing Filing and Consideration of Second Petition, *In re Will*, 17-70022, at 55-57 (Fifth Circuit Application).  And his presentation of this argument closely resembles his presentation of the same argument in state court, which prompted the state court to examine this argument at length.  Docket No. 57, Ex. 71 at 23-25; Docket Entry No. 57, Ex. 74 at 742-44. It is true that Will provides a case citation to *Brady* only in a footnote.  But the contours of his argument are clear in his initial petition, his amended

petition, and his motion for authorization filed in the Fifth Circuit. The Court finds that the suppression of evidence surrounding Ms. Simmons's testimony is properly encompassed within the scope of Will's *Brady* claim.

Will asks this Court to allow extensive factual development and an evidentiary hearing before deciding whether he has passed through the second gateway. AEDPA sharply restricts the introduction of new evidence in any federal habeas proceeding. For the purposes of the limited question currently before the Court, the section 2244(b)(2)(B) review only needs to focus on the state court record. With that focus, the Court finds that the state court record provides an adequate basis to decide if Will has met his AEDPA burden.

With that in mind, the Court looks to Will's briefing to see if he has shown (1) due diligence and (2) actual innocence that will allow his claim to proceed.

## II.    Due Diligence

This Court must dismiss this case if Will cannot show that "the factual predicate for [his *Brady*] claim could not have been discovered previously through the exercise of due diligence." 28 U.S.C. § 2244(b)(2)(B)(i). The Fifth Circuit has held that a court measures an inmate's diligence under section 2244(b)(2)(B)(i) "objectively, not by the subjective diligence of the petitioner." *Will*, 970 F.3d at 541-42 (quoting *Blackman*, 909 F.3d at 779); *see also Johnson v. Dretke*, 442 F.3d 901, 908 (5th Cir. 2006) ("[T]he plain text of § 2244(b)(2)(B) suggests that due diligence is measured against an objective standard, as opposed to the subjective diligence of the particular petitioner of record."). A court asks if an inmate who acted diligently could have discovered "the factual basis for the new claim" and then "included [it] in the first petition." *In re Davila*, 888 F.3d 179,

184 (5th Cir. 2018); *see also Johnson*, 442 F.3d at 910 (focusing the due diligence inquiry on the time "before the filing of the first habeas petition").

A *Brady* claim requires a showing that the prosecution suppressed evidence.  *See Pippin v. Dretke*, 434 F.3d 782, 789 (5th Cir. 2005) (observing that a *Brady* claim requires a three-part showing: "(1) the prosecutor suppressed evidence, (2) favorable to the defense, and (3) material to guilt or punishment").  An inmate's claim that the State suppressed evidence has some overlap with an inmate's duty under AEDPA to show he could not have raised a claim earlier.  Still, the substance of a *Brady* claim and the AEDPA showing are separate.  The Fifth Circuit has held that section 2244(b)(2)(B)(i) "must be resolved prior to, and independently of, consideration of the similar elements of a *Brady* claim." *Johnson*, 442 F.3d at 909.[10]

Will provides a timeline of events which he alleges shows sufficient diligence to meet the requirements of section 2244(b)(2)(B)(i).  (Docket Entry No. 37 at 10-12).  To summarize, the trial prosecutors promised to turn over any *Brady* material.  Will's trial attorneys specifically requested information about Rosario.  Will secured an affidavit from an attorney with the Harris County District Attorney's Office stating that both *Brady* and the Office's open-file policy would have required disclosure of the challenged documents. The officer who prepared the Hit Document refused to comply with a subpoena *duces tecum* and testified in court that he did not have any documents relating to Will's case. Even though several attorneys sought records and reviewed the prosecutor's files, no one discovered the Hit Document or Schifani Report until after Will filed his federal petition. (Docket Entry No. 37 at 12).

---

[10]     The Court notes that, when deciding Will's *Brady* claim, the state courts assumed that the State had withheld the two challenged documents.  (Docket Entry 57, Ex. 74 at 738-39).

Aside from Will's general diligence seeking material, a reasonable person would have no specific reason to suspect that the challenged documents existed, much less that they had been withheld.  *See Will*, 970 F.3d at 542 n. 23 ("[W]here a defendant has actual knowledge that exculpatory evidence exists—such as when a defendant knows that a witness provided false, or later recanted, incriminating testimony—the due diligence requirement cannot be satisfied if that evidence was not pursued.").

In the motion to dismiss, Respondent provides a counterposing timeline which identifies points at which, assuming that the State had not suppressed the material, an attorney could have made efforts to find the two documents.  Respondent speculates that Will should have known that Deputy R.W. Strickland (the author of the Hit Document) had lied and withheld documents from the defense.  Respondent also suggests that the documents in question were in the State's files all along and that the initial state and federal attorneys just did not look hard enough.  (Docket Entry No. 42 at 23, n. 14).

But the Supreme Court has never held that "defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004).  The State told that defense that it had an open file policy; the defense could reasonably rely on that promise  *See Strickler v. Green*, 527 U.S. 263, 283 n.23 (1999) ("[I]f a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*."); *Smith v. Maggio*, 696 F.2d 365, 367 (5th Cir. 1983) ("Counsel had no duty to file pretrial motions, because the prosecutor established an open file policy that made the filing of discovery motions or *Brady* requests pointless.").  Will searched the prosecution's records and made

efforts to secure information about Rosario.  Despite generalized concerns that Deputy Strickland withheld material, nothing suggests that a reasonable attorney should have been specifically aware of the two challenged documents and made efforts to discover them. The record does not show when the two challenged documents were placed in the State's files or how they got there, but it appears that Will made reasonable efforts to find relevant information.

The Court finds that Will has met section 2244(b)(2)(B)(i)'s requirement that "the factual predicate for [his *Brady*] claim could not have been discovered previously through the exercise of due diligence."  While the analysis above travels a somewhat-similar path, the Court emphasizes that this is not a finding that the prosecution suppressed evidence under *Brady*.  Ultimate questions about whether Will has proven the merits of his *Brady* claim must wait until full consideration of the facts and record.  Still, the Court finds that Will has met the showing necessary for this case to move forward.

### III.    AEDPA's Actual-Innocence Inquiry

After an inmate has shown diligence under section 2244(b)(2)(B)(i), he must then show that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2244(b)(2)(B)(ii).  The Supreme Court has stated that section 2244(b)(2)(B)(ii) is a "modified version" of habeas law's miscarriage of justice exception—in other words, a revised actual-innocence inquiry.  *See McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013).  The parties' original briefing failed to recognize how AEDPA's text modified the actual-innocence standard.  The Court ordered the parties to brief the law

on this portion of section 2244(b)(2)(B)(ii).  The parties' subsequent briefing debates how to interpret various provisions of the relevant statute.

Understanding the proper interpretation of a statute "almost always start[s] with a careful consideration of the text." *Brnovich v. Democratic National Committee*, ___ U.S. ___, 141 S. Ct. 2321, 2337 (2021).  Here, the successiveness question is best understood by placing Will's arguments in the context of each independent phrase from section 2244(b)(2)(B)(ii).  The Court will examine whether: (A) the facts underlying the claim, (B) if proven and (C) viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, (D) but for constitutional error, (E) no reasonable factfinder would have found the applicant guilty of the underlying offense.

## A.     "Facts Underlying the Claim"

Will's new *Brady* claim primarily relies on two pieces of evidence: the Hit Document and the Schifani Report.[11]  In tentatively authorizing successive proceedings, the Fifth Circuit summarized the "Hit document" as follows:

> . . . the Hit Document . . .  reveals that Rosario was placed in administrative separation for soliciting another to 'make a hit' on Will. The timing of the document is important. It suggests that Rosario attempted to have Will, the only other witness to Deputy Hill's murder, killed prior to trial—before Will could testify against him. Though this evidence is not immune from attack, it does provide convincing evidence that Rosario—not Will—had testimony to bury.

*Will*, 970 F.3d at 546.[12]

---

[11]     As discussed above, these are not the *only* pieces of evidence on which Will relies. He also focuses on the suppression of evidence that the police showed Ms. Simmons graphic pictures of Deputy Hill's body. Further, the State disclosed additional evidence only after Will filed his Petition. Nevertheless, this Order focuses on these two main pieces of evidence because, even without more, they are enough for Will's Petition to proceed through this stage.

[12]     It is unclear what the Fifth Circuit meant by the phrase "before Will could testify against him." Nothing in the record suggests that the State planned to call Will as a witness against Rosario in his trial for

The Schifani Report is a memorandum Deputy Patricia Schifani wrote on December 9, 2000, regarding an interchange with Rosario two days before.  Will cites two statements in that report as evidence that Rosario was the one who shot Officer Hill: (1) Rosario claimed to be "part of the reason" Deputy Schifani was wearing a mourning badge cover in honor of Deputy Hill and (2) "pointed at his armband caution text which indicated '*PROTECTION*'" and said, "I'm high-profile! Do you know who my father is?"  Will describes the inferences that he alleges a jury could make based on the Schifani Report:

> Rosario was not the distant bystander to Deputy Hill's murder that the State described throughout trial; he confessed his active participation in the shooting to Deputy Schifani, relying on the perceived protection of his father, and then sought to kill the only witness to his crime, Rob Will.  . . . [T]his is "convincing evidence" that Mr. Will was not the shooter.

(Docket Entry No. 37 at 4).[13]

## B.     "If Proven . . ."

AEDPA asks the Court to consider how the "facts underlying the claim" would appear "if proven."  28 U.S.C. § 2244(b)(2)(B)(ii).  Respondent interprets this phrase as imposing a burden "to 'prove' the facts underlying his claim . . . ."  (Docket Entry No. 73 at 4); *see also* (Docket Entry No. 73 at 8) (referring to "the petitioner's requirement to 'prove' facts").  But this is not the adjudicative stage.  Section 2244(b)(2)(B)(ii) only mentions *proof* as part of a broader statement: the Court considers the evidence "*if proven* and viewed in light of the evidence as a whole."  The Court then looks to see what it "*would*

---

auto theft.  Possibly, the Fifth Circuit meant that Rosario anticipated that Will would take the stand in his own capital murder case and would blame the killing on Rosario.

[13]     In making that statement, however, Will misstates the opinion by the Fifth Circuit preliminarily authorizing these proceedings.  Will says, "As the court of appeals held, this is 'convincing evidence' that Mr. Will was not the shooter."  (Docket Entry No. 37 at 4).  The Fifth Circuit, however, actually stated: "Though this evidence is not immune from attack, it does provide convincing evidence that Rosario—not Will—*had testimony to bury*."  *Will*, 970 F.3d at 546 (emphasis added).

establish." Thus, section 2244(b)(2)(B)(ii) contains a conditional phrase. A court looks at an inmate's facts "*if* proven" and does so to decide if they "would be" (not, "are") sufficient to convince a jury that he is not guilty.

The inquiry at this stage warrants comparison to Fed. R. Civ. P. 12(b)(6) under which a claim survives a motion to dismiss when the plaintiff raises any set of facts that, if proven at trial, would entitle them to recover. *See, e.g.*, *Hamilton v. United Healthcare of Louisiana, Inc.*, 310 F.3d 385, 388 (5th Cir. 2002) ("Rule 12(b)(6) motions should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.") (quotation omitted); *Babb v. Dorman*, 33 F.3d 472, 475 (5th Cir. 1994) ("To survive a motion to dismiss in cases where the qualified immunity defense is raised, a plaintiff must state facts, which if proven, would defeat the defense."). Similar to the Rule 12(b)(6) inquiry, some circuits have explicitly stated a court accepts a petitioner's allegations as true under section 2244(b)(2)(B)(ii). *See In re Bolin*, 811 F.3d 403, 408 (11th Cir. 2016) ("[H]e must allege newly discovered facts that, taken as true, establish a constitutional error."); *In re Boshears*, 110 F.3d 1538, 1541 (11th Cir. 1997) (observing that section 2244(b)(2)(B)(ii) require a court to "accept [an inmate's facts] as true for purposes of evaluating the application").

All along, Will has attributed the shooting to Rosario. If proven, the underlying allegations in Will's successive petition contain a confession by Rosario that he had a role in the killing. Will then supports that evidence with a document showing that Rosario ordered a hit on him, presumably indicating that Rosario wanted to kill the only witness who saw him kill a police officer. If proven, the evidence underlying Will's successive petition may be the strongest yet implicating Rosario in the murder.

C.     **"Viewed in Light of the Evidence as a Whole"**

After isolating the evidence which Will wishes to prove, AEDPA asks that it be "viewed in light of the evidence as a whole . . . ."  28 U.S.C. § 2244(b)(2)(B)(ii).  The parties debate what exactly evidence constitutes "the whole."  This question has a practical application in this case.  Respondent wants this Court to confine its analysis to the evidence specifically underlying Will's successive *Brady* claim and the trial court record.   Will, on the other hand, asks for an expansive review which includes his new *Brady* claim; evidence from his state habeas proceedings which is external to his *Brady* claim, such as K-9 tracking evidence; and evidence which has come to light since he came to federal court, such as the material which the State kept in its "work product" folder.

*1.     Pre-AEDPA Supreme Court Law*

Courts have looked to the Supreme Court's pre-AEDPA actual-innocence law for guidance in interpreting section 2244(b)(2)(B)(ii).  Before AEDPA, the Supreme Court recognized two different actual-innocence standards.  First, federal courts considered an inmate's innocence of his conviction under the "fundamental miscarriage of justice" standard found in Supreme Court cases such as *Schlup v. Delo*, 513 U.S. 298 (1995).  The *Schlup* standard broadly allows an inmate to "establish through new and reliable evidence that it was more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  *Woodfox v. Cain*, 609 F.3d 774, 794 (5th Cir. 2010) (internal quotation marks and citation omitted).  Under that standard, a "habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 537 (2006) (internal quotation marks and citation omitted).

Second, the Supreme Court adopted a stricter review of innocence when an inmate alleged actual innocence of a punishment.  To show "actual innocence" of a death sentence, the Supreme Court required inmates to "show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."  *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992).  The "more stringent *Sawyer* standard" contains two features that differ significantly from the *Schlup* standard.  *Schlup*, 513 U.S. at 326.  First, *Sawyer* imposed a "clear and convincing" requirement which imposes a higher burden of proof than *Schlup*'s "more-likely-than-not" standard.  *See Schlup*, 513 U.S. at 327.  Second, *Sawyer* considered a much narrower range of evidence.  *See Sawyer*, 505 U.S. at 345-46 ("A federal district judge confronted with a claim of actual innocence may with relative ease determine whether a submission . . . consists of credible, noncumulative, and admissible evidence negating the element of intent.").  In contrast to the *Schlup* review of all available evidence, *Sawyer* focuses on "the evidence allegedly kept from the jury due to an alleged [constitutional] violation."  *Sawyer*, 505 U.S. at 349.[14]

### 2.     *AEDPA's Incorporation of Actual-Innocence Jurisprudence*

Congress obviously had the Supreme Court's actual-innocence jurisprudence in mind when it enacted AEPDA.  Congress transposed portions of the judge-made innocence

---

[14]     Evidence of innocence under *Sawyer* must focus directly on whether an "defendant [is] eligible for the death penalty," not on other "evidence that was prevented from being introduced as a result of a claimed constitutional error."  *Sawyer*, 505 U.S. at 347; *see also White v. Thaler*, 522 F. App'x 226, 233 (5th Cir. 2013).  In other words, *Sawyer* "require[d] petitioners to link their exculpatory evidence to a specific constitutional error that prevented the jury from adequately considering the evidence."  *O'Dell v. Netherland*, 95 F.3d 1214, 1247 n.26 (4th Cir. 1996); *see also Morris v. Dretke*, 90 F. App'x 62, 68 (5th Cir. 2004) ("If . . . a capital petitioner challenges his death sentence, based on reliable evidence not presented at trial, again because of constitutional error, the petitioner must show by clear and convincing evidence that no reasonable juror would have found the petitioner eligible for the death penalty in light of the new evidence."); *Jacobs v. Scott*, 31 F.3d 1319, 1325 (5th Cir. 1994) (finding *Sawyer* inapplicable if the allegations of innocence are not tethered to an  independent constitutional error).

standards into the new AEDPA requirements for review.  Specifically, Congress relied on actual-innocence law when writing (1) section 2244(b)(2)(B)(ii); (2) section 2254(e)(2) which establishes the threshold for obtaining an evidentiary hearing on claims the petitioner failed to develop in state court;[15] and (3) section 2255(h)(1) which establishes the standard for successive motions for federal inmates.[16]

Congress crafted section 2244(b)(2)(B)(ii) to contain "a strict form of 'innocence, roughly equivalent to the Supreme Court's definition of 'innocence' . . . in *Sawyer*." *In re Rodriguez*, 885 F.3d 915, 918 (5th Cir. 2018); *see also Will*, 970 F.3d at 543; *In re Davila*, 888 F.3d 179, 186 (5th Cir. 2018); *Johnson*, 442 F.3d at 911; 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice & Procedure § 28.3e, at 1459-60 (5th ed. 2005). In doing so, "Congress rejected the *Schlup* standard and reverted to the *Sawyer* standard when it enacted § 2244(b)(2)(B)." *Rivas v. Fischer*, 687 F.3d 514, 541 (2nd Cir. 2012); *see also House*, 547 U.S. at 539 (finding the section 2244(e)(2)(B)(ii) standard differs from the *Schlup*).

But Congress chose to deviate slightly from the *Sawyer* review.  *See In re Webster*, 605 F.3d 256, 258-59 (5th Cir. 2010).  *Sawyer* concerned itself with being "eligible for the death penalty" and section 2244(b)(2)(B)(ii) applied to cases in which the inmate claimed not to be "guilty of the underlying offense."  *See Thompson v. Calderon*, 151 F.3d 918,

---

[15]  Section 2254(e)(2) only allows for an evidentiary hearing when "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

[16]  In comparison, Congress amended the statute for federal motions, section 2255(h)(1), to permit a successive petition if the petitioner puts forward "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." 28 U.S.C. § 2255(h)(1).  While likewise based on *Sawyer*, this standard differs from section 2244(b)(2)(B)(ii) in application to "newly discovered evidence" and not including the phrase "but for constitutional error."

923 (9th Cir. 1998) (noting differences between AEDPA and *Sawyer*); *see also In re Webster*, 605 F.3d 256, 259 n.7 (5th Cir. 2010) (relying on *Thompson*).[17]  Also, Congress introduced a new phrase into *Sawyer*'s actual-innocence standard a new phrase: the inmate must focus on "the facts underlying the claim" but "if proven and viewed in light of the evidence as a whole."[18]

> 3.    *Circuit Interpretation of Actual Innocence Requirement*

A circuit split exists over how to interpret section 2244(b)(2)(B)(ii)'s actual-innocence requirements.  The Fourth and Sixth Circuits suggest that the "evidence as a whole" language in section 2244(b)(2)(B)(ii) intended to codify a broad *Schlup*-like review of all evidence.  *See Long v. Hooks*, 972 F.3d 442, 470 (4th Cir. 2020); *Clark v. Warden*, 934 F.3d 483, 496 (6th Cir. 2019); *United States v. MacDonald*, 641 F.3d 596, 612 (4th Cir. 2011); *Lott v. Bagley*, 569 F.3d 547 (6th Cir. 2008) (summarily adopting the reasoning of a district court which had employed *Schlup*-type review).  Those circuits use the *Schlup* inquiry and look at all available evidence, old and new, whether admissible at trial or not.

The Tenth Circuit generally treats section 2244(b)(2)(B)(ii) as a codification of the *Sawyer* standard.  The Tenth Circuit observed that, like *Sawyer*, section 2244(b)(2)(B)(ii) "binds together a successive applicant's claim of actual innocence and his claim of

---

[17]    Congress' choice of language which extended the breadth of the *Sawyer* standard raised the question of whether AEDPA "replaced the *Schlup* standard with a stricter test based on *Sawyer*."  *House*, 547 U.S. at 539.  In *House*, the Supreme Court held that AEDPA did not eviscerate the *Schlup* standard in one category of cases: "a first federal habeas petition seeking consideration of defaulted claims based on a showing of actual innocence."  547 U.S. at 339.  The Supreme Court, however, reached that decision by drawing a contrast between initial habeas petitions and the places in which Congress inserted language from *Sawyer* into AEDPA.

[18]    "Under the canons of statutory construction, the similarity of the language between *Sawyer* and § 2244(b)(2)(B)(ii) potentially cuts both ways. On the one hand, the fact that the standards are nearly identical suggests that Congress intended to codify the *Sawyer* standard. On the other hand, the slight difference between the two could be read as suggesting that Congress intended just the opposite: to enact a provision similar to but more stringent than the *Sawyer* standard."  *Thompson*, 151 F.3d at 923.

constitutional error." *Case v. Hatch*, 731 F.3d 1015, 1033-34 (10th Cir. 2013).[19]

Accordingly, the Tenth Circuit founds "as a textual matter, subparagraph (B)(ii) excludes

the consideration of evidence unconnected to the constitutional error at trial." *Id.* Thus,

the Tenth Circuit interprets the "evidence as a whole" language to mean a "factual universe

[that] does not encompass either new facts that became available only after trial, nor does

it include facts not rooted in constitutional errors occurring during trial." Brian R. Means,

Innocence, Federal Habeas Manual § 11:30 (citing *Case*, 731 F.3d at 1034, 1038)

("subparagraph (B)(ii) excludes the consideration of evidence unconnected to the

constitutional error at trial.[20]

The Eleventh Circuit employs a hybrid standard which holds that an inmate must

make two separate showings: "(1) 'clear and convincing evidence of actual innocence,'

and (2) another, separate 'constitutional violation.'" *In re Dailey*, 949 F.3d 553, 559 (11th

Cir. 2020) (quoting *In re Davis*, 565 F.3d 810, 823 (11 Cir. 2009). The Eleventh Circuit

calls this "the 'actual innocence plus' standard." *In re Everett*, 797 F.3d 1282, 1290 (11th

Cir. 2015) (quoting *Davis*, 565 F.3d at 823).

The Fifth Circuit has not directly confronted the circuit split concerning the

applicable standard. Without significant elaboration the Fifth Circuit has cited the Tenth

Circuit's standard approvingly. *See In re Young*, 789 F.3d 518, 529 (5th Cir. 2015).[21]

---

[19]    The Tenth Circuit found support for "this linkage requirement" in the Supreme Court's reading of section 2244(b)(2)(B)(ii) to require that "the facts underlying the [constitutional] claim establish [a petitioner's] innocence by clear and convincing evidence." *Calderon v. Thompson*, 523 U.S. 538, 558 (1998) (emphasis added).

[20]    The Eighth Circuit has not engaged in a substantive examination of the question, but has seemingly adopted an approach similar to the Tenth Circuit. *See Rhodes v. Smith*, 950 F.3d 1032, 1036 (8th Cir. 2020) ("[W]e must determine whether this new evidence, when added to the 'body of evidence produced at trial,' clearly and convincingly shows no reasonable factfinder would have found Rhodes guilty of murdering his wife.").

[21]    The Fifth Circuit cited *House* when stating that it would "consider both the new evidence and the existing evidence in assessing the likely impact of the *Brady* material on reasonable jurors." *Will*, 970 F.3d

4.      *Actual Innocence in this Case*

The Court does not need to resolve the circuit split.  As discussed below, Will has met the AEDPA standard under the most restrictive review imposed by the Tenth Circuit. The Court, therefore, will consider Will's successive petition under the same "the universe of facts" as the Tenth Circuit, consisting "only of evidence presented at the time of trial, adjusted for evidence that would have been admitted or excluded 'but for constitutional error' during trial proceedings."  *Case*, 731 F.3d at 1034.  In other words, the Court will plug the evidence underlying Will's *Brady* claim—taking it for granted that he can prove that evidence—into the evidence at trial.

**D.      "But for Constitutional Error"**

AEDPA specifically asks the Court to place Will's evidence into the jury's deliberations as they would have existed "but for" the constitutional error.  This inquiry recenters the focus on an alleged violation of constitutional law, not an existential question of whether the inmate is innocent or guilty.  The phrase "but for" essentially asks why something did not happen.  The question is whether a reasonable jury would have found the inmate guilty except for the alleged constitutional claim—in other words, asking if the constitutional error prevented the jury from finding him not guilty.  *See Jenkins v. Hutton*, 137 S. Ct. 1769, 1772 (5th Cir. 2017) (considering similar language from *Sawyer* to remind

---

at 543.  But the Fifth Circuit was explicit in its own analysis: it "only consider[ed] the evidence that the jury received. [It was] not factoring in, for example, evidence that was excluded from trial, affidavits or evidence that were uncovered post-trial, or counsels' opening and closing statements."  *Will,* 970 F.3d at 546 n.37. The Fifth Circuit did not address all facts and arguments Will put before it, but only that from trial and the evidence related to his *Brady* claim.

that the inquiry does not look at "whether the alleged error might have affected the jury's verdict," but analyzes what the jury would have done absent the alleged error).

  E. **"Sufficient to Establish by Clear and Convincing Evidence that No Reasonable Factfinder Would Have Found the Applicant Guilty of the Underlying Offense"**

  As the capstone of the AEDPA second-gateway inquiry, an inmate must insert his new claim into the evidence from trial and show that it "would be sufficient to establish by clear and convincing evidence that . . . no reasonable factfinder would have found [him] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B).

  Before considering whether Will has made the showing which would entitle him to further proceedings, the Court pauses to reiterate that this is not a conclusive determination of his successive claim.  This is only a second gateway, not an adjudication of the merits.  This matter comes before this Court with a richer factual record and fuller legal briefing than Will could present in the circuit court.  Unlike the circuit court which operates under a statutory timeline in making its prima facie assessment, this Court may perform a more in-depth probe of the facts and the law.  But making too much of this gateway would violate AEDPA's text and blur the lines between threshold review and adjudication of the merits.  This Court engages in a "'thorough' review," but only of whether the petition "'conclusively' demonstrates that it does not meet AEDPA's second or successive motion requirements."  *Reyes-Requena*, 243 F.3d at 898-99.  The second-gateway review is independent from an adjudication of the merits.

  F. **Will's *Brady* Claim Satisfies the Requirements of Section 2244(b)**

  The Court finds that Will can proceed through the second gateway.  This Court particularly considers Will's evidence in the context of its long background with the case.

The Court has previously commented on the "considerable evidence supporting Will's innocence" and "total absence of eyewitness testimony or strongly probative forensic evidence."  The Court has previously noted "disturbing uncertainties" about Will's culpability.  Since then, Will has uncovered even more information that would have been useful to his trial defense team.

All along, it has been clear that Rosario played some part in the events which resulted in Deputy Hill's death.  The State's case at trial alleged that his part was only to flee from police.  At trial, the jury heard from a jail inmate who said that Rosario had claimed responsibility for the killing.  The jury's verdict suggests that they did not believe his testimony.

The instant petition is far from the first time Will used Rosario's statements while incarcerated to call his guilt into question.  Inmate testimony has proven important at all stages of this case.  In his initial habeas petition, Will claimed to be actually innocent based on affidavits from three inmates who were incarcerated in the Harris County Jail at the same time as Will and Rosario.  Will now relies on another inmate witness' testimony to covey a familiar refrain: Rosario claimed to have been the killer.  And, as before, this Court's concern is with the credibility of the evidence Will raises.

The Schifani Report contains a similar admission by Rosario to a second witness, but one who did not suffer from the credibility concerns that his trial testimony faced.  Assuming for the purposes of this Order that the Schifani Report means what Will says it does, it shows that Rosario may not have been a distant bystander or fleeing robber, but an active participant in the shooting.  The information in the Hit Document not only supports that testimony, it also reaffirms its credibility by suggesting that law enforcement officers

believed that Rosario wanted Will to be killed.  Will describes how the Hit Document would benefit the defense: "Rosario solicited the Texas Syndicate to make a hit on Mr. Will, Deputy Strickland believed Cruz was involved, the lead detective and lead prosecutor were also aware of the hit, and the State covered it all up." (Docket Entry No. 58 at 20-21.) Taking the two documents together "shows that not long after Rosario admitted playing an active role in the shooting, he actually attempted to kill the only other witness to the crime." (Docket Entry No. 58 at 23).

Will argues that "[t]hroughout trial, the prosecution stressed that the strongest evidence of Rob Will's guilt was the contrast between his 'desperate' actions to avoid getting caught and Rosario's lack of any incriminating conduct after the shooting." (Docket Entry No. 74 at 34).  In fact, "[i]n the final moment of the State's closing argument, the prosecution reached the bottom line of its case: the total lack of eyewitness testimony or any probative forensic evidence against Rob Will did not matter because the evidence showed that after the murder, Michael Rosario showed no signs that he was guilty." (Docket Entry No. 74 at 34).  The jury previously had little reason to find Rosario played a part in the murder, other than the testimony of one inmate to whom he had allegedly confessed.  With the evidence underlying the new *Brady* claim, the jury could find support for the inmate testimony and see reasons to believe that Rosario acted in a guilty manner. In the context of all the evidence, and considering all the other uncertainties raised by the trial evidence, Will has shown that his *Brady* claim passes through AEDPA's second gateway.  His claims should be heard.

## IV.     Adjudicating Will's Successive Petition

Passing through the second gateway, Will's petition may proceed to adjudication. In doing so, however, Will's petition falls within other AEDPA restrictions.  Will has exhausted his current *Brady* claim in state court.  The state courts rejected Will's *Brady* claim.  In doing so, the state courts made explicit factual findings and legal conclusions. AEDPA places tight constraints on what the Court may consider and how the Court may view the state court's adjudication.  For example, the Supreme Court has recently discussed how section 2254(e)(2) limits a federal court's ability to hold an evidentiary hearing or consider new evidence.  *See Shinn v. Ramirez*, ___ U.S. ___, 142 S Ct. 1718, 1739 (2022).

Even so, questions remain unresolved about what evidence may be considered as the case progresses.  The Court expresses concern that the State has only recently turned over evidence that it had previously withheld as "work product."  Had the State revealed that information at trial or during the earlier state post-conviction proceedings, the state courts could have factored it into a discussion of Will's current *Brady* claim.  It seems unfair to allow the State the benefit of hiding material from the defense until procedural hurdles render it unusable.  The parties will have to brief how the Court may consider the newly disclosed information—if it can consider it at all—under AEDPA.

### Pending Motions

Four motions are pending.  First, Will has filed an opposed motion for discovery. (Docket Entry No. 59).   Will seeks factual development both "to support pending allegations and evidence justifying his right to habeas corpus relief under *Brady*" and "to augment evidence of innocence under 28 U.S.C. § 2244(b)(2)(B) and gateway innocence pursuant to *Schlup v. Delo*, 513 U.S. 298 (1995)."  (Docket Entry No. 59 at 1).  Second,

Will complements his discovery requests with a motion for an evidentiary hearing. (Docket Entry Nos. 59, 60). The Court finds that it has sufficient facts before it to decide the threshold question of whether successive proceedings are appropriate under AEDPA. The Court, therefore, will **deny** Will's motions for discovery and for an evidentiary hearing **without prejudice**.

Successive habeas proceedings are not a retrial of Will's guilt. AEDPA places strict constraints on the development of new evidence in habeas actions. The parties must provide additional briefing before the Court can decide if discovery or a hearing are permissible. Will may renew his requests for factual development involving his successive petition throughout the proper course of adjudication.

Third, a sealed, *ex parte* motion for the approval of a litigation budget is pending. (Docket Entry No. 56). Without detailing the contents of the sealed pleading, Will's proposed budget anticipates significant factual development in this case. As the Court has not authorized any factual development at this time, and the course of the litigation has changed since Will filed his motion, the Court will need a revised proposed budget. The Court **denies** Will's sealed motion **without prejudice**.

Fourth, Will filed a motion for leave to file excess pages regarding his supplemental briefing. (Docket Entry No. 76). The Court will **grant** his motion.

Earlier in this case, Respondent filed a motion to dismiss. (Docket Entry No. 42.) The Court denied that motion subject to *sua sponte* reconsideration after the parties provided additional briefing. (Docket Entry No. 67.) This Order resolves the questions raised by the earlier motion to dismiss.

## Conclusion

For the reasons discussed above, the Court finds that Will has complied with AEDPA's requirements for the consideration of his successive federal habeas corpus petition. In addition, the Court grants Will's motion for leave to file excess pages. (Docket Entry No. 76). The Court denies Will's *ex parte* sealed motion (Docket Entry No. 56), opposed motion for discovery (Docket Entry No. 59), and opposed motion for an evidentiary hearing (Docket Entry No. 60).

Will has requested permission to amend his federal petition. (Docket Entry No. 37 at 67). Will may file any amended petition within **sixty days** from the entry of this Order. Will shall either include in the amended petition or in a separate document arguments which shoulder his burden under AEDPA. Respondent may file an answer and any appropriate responsive motion within **sixty days** thereafter. Will may file a reply **thirty days** afterwards. The Court will consider any future request for factual development in the context of Will's burden under AEDPA.

It is so **ORDERED.**

Signed at Houston, Texas on March 28, 2023.

Keith P. Ellison
United States District Judge