**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **ROBERT GENE WILL, II,** )<br>Petitioner, )<br>)<br>**v.** )<br>)<br>**BOBBY LUMPKIN,** )<br>Director, Texas Department of Criminal Justice, )<br>Correctional Institutions Division, )<br>Respondent. )<br>) | Civil Action No. 4:15-CV-3474<br>***CAPITAL CASE*** |

**PETITIONER'S AMENDED OMNIBUS MOTION FOR LEAVE TO CONDUCT
DISCOVERY, INCLUDING DEPOSITIONS**

Gretchen N. Scardino
Texas Bar No. 24037170
gretchen@scardinollp.com
SCARDINO LLP
111Congress Avenue, Suite 500
Austin, TX 78701
(512) 443-1667

Samy Khalil
Texas Bar No. 24038997
samy@klfirm.law
KHALIL & LAKE
4200 Montrose Boulevard, Suite 440
Houston, TX 77006
(713) 904-4477

Chad Flores
Texas Bar No. 24059759
cf@chadflores.law
FLORES LAW PLLC
917 Franklin Street, Suite 600
Houston, TX  77002
(713) 951-3700

Jason C. Ewart
District of Columbia Bar No. 484126
jason.ewart@arnoldporter.com
Karen C. Otto
karen.otto@arnoldporter.com
District of Columbia Bar No. 995361
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000

Adam Dinnell
Texas Bar No. 24055405
adinnell@shjlawfirm.com
SCHIFFER HICKS JOHNSON PLLC
700 Louisiana Street, Suite 2650
Houston, TX  77002
(713) 357-5150

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................................1

I.    BACKGROUND...........................................................................................................2

    A.    In the Early Morning of December 4, 2000, HCSO Deputy Barrett Hill and his Partner Respond to a Report of a Vehicle Break-in at an Apartment Complex, and Deputy Hill Is Shot and Killed During the Ensuing Chase of Two Suspects...................................................................................................2

    B.    Rosario Stays Near the Scene, Acting Erratically and Drawing the Suspicion of Other Witnesses.  Almost Immediately, He Begins to Leverage his Family's Law Enforcement Connections to Distance Himself from the Murder .......................3

    C.    At Trial, the State Portrays Rosario as a Distant Bystander to Deputy Hill's Murder, and Draws a False Contrast Between the "Desperation" of Mr. Will and the Innocent Behavior of Rosario *After* the Murder.................................................6

    D.    More Than Ten Years Later, the HCDA Discloses, for the First Time, Jail Records Indicating that Rosario Bragged About his Role in the Murder to a HCSO Deputy and Solicited a Hit on Mr. Will While They Were Housed in the Harris County Jail ...................................................................................7

    E.    In State Habeas Proceedings, the HCDA Sponsors Affidavits from Ms. Parsons and Deputy Strickland in Which They Denied Any Knowledge of the Schifani Report or a Hit Taken Out on Mr. Will..........................................................................8

    F.    Mr. Will's Attempts at Further Factual Development Are Stymied by the State Trial Court...........................................................................................................9

    G.    Mr. Will Returns to Federal Court After Exhaustion, and the Fifth Circuit Authorizes the Successive Petition ................................................................................10

    H.    Additional *Brady* Evidence is Disclosed by the HCDA on June 23, 2022.............10

    I.    This Court Authorizes Mr. Will to File a Successive Petition............................11

    J.    This Court Finds that the State-Court Decision Was Contrary to Federal Law and that Mr. Will's *Brady* Claim is Entitled to *De Novo* Review...............................11

II.   ADDITIONAL *BRADY* EVIDENCE DISCLOSED BY THE HCDA ON JUNE 23, 2022 .........................................................................................................12

III.  MOTION FOR LEAVE TO CONDUCT DISCOVERY, INCLUDING DEPOSITIONS ........................................................................................................19

i

A.    Legal Standards Governing Fact Development Procedures in Section 2254 Cases ................................................................................................19

B.    Depositions of Witnesses Under Habeas Rule 6 and Federal Rule of Civil Procedure 45 Are Justified in Light of Recent Developments and Disclosures Exculpating Mr. Will, Implicating Rosario, and Impeaching the State's Methods of Investigation..........................................................23

    1.    Good Cause Exists to Depose Former and Current HCDA and HCSO Personnel........................................................................23

    2.    Good Cause Exists to Depose Former Harris County Jail Inmates Rene Gonzales, Scott Craig, Victor Coronado, Richard Lucio, David Cruz, and Anthony Riojas ...................................................24

    3.    Good Cause Exists to Depose Rosario, his Father, and his Mother....................25

    4.    Good Cause Exists to Depose Cassandra Simmons and Christopher Alexander ............................................................................27

    5.    Good Cause Exists to Depose Marshall Greenlee and Yvonne Greenlee ...........29

    6.    Good Cause Exists to Depose Gerald Cormier, Jr., Gerald Cormier, Sr., Cory Moore, and Pia Koehler...............................................32

C.    Good Cause Exists to Authorize Service of Subpoenas, Pursuant to Habeas Rule 6 and Federal Rule of Civil Procedure 45, for Documents Held by the HCDA, HCSO, HPD, and Other Law Enforcement Agencies and Witnesses Which Are Necessary to Establish the State's Suppression of Exculpatory Evidence........................................................................................34

CONCLUSION...................................................................................................45

# TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*Anderson v. Johnson,*
   338 F.3d 382 (5th Cir. 2003) ................................................................................22

*Blackledge v. Allison,*
   431 U.S. 63 (1977)................................................................................................20

*Bracy v. Gramley,*
   520 U.S. 899 (1997)..................................................................................19, 20, 21

*Brady v. Maryland,*
   373 U.S. 83 (1963)..................................................................................................1

*Coleman v. Zant,*
   708 F.2d 541 (11th Cir. 1983) ............................................................................21

*East v. Johnson,*
   123 F.3d 235 (5th Cir. 1997) ..............................................................................21

*East v. Scott,*
   55 F.3d 996 (5th Cir. 1995) ................................................................................21

*Harris v. Nelson,*
   394 U.S. 286 (1969)............................................................................................19

*Herrera v. Collins,*
   506 U.S. 390 (1993)............................................................................................21

*Holmes v. South Carolina,*
   547 U.S. 319 (2006)............................................................................................18

*In re Will,*
   970 F.3d 536 (5th Cir. 2020) ........................................................................10, 20

*Jones v. Wood,*
   114 F.3d 1002 (9th Cir. 1997) ............................................................................20

*Kyles v. Whitley,*
   514 U.S. 419 (1995)......................................................................................26, 34

*McFarland v. Scott,*
   512 U.S. 849 (1994)............................................................................................22

*Murphy v. Johnson*,
    205 F.3d 809 (5th Cir. 2000) ...................................................................19, 21

*Peoples v. State*,
    874 S.W.2d 804 (Tex. App—Fort Worth 1994, pet. ref'd) ....................................18

*Strickler v. Greene*,
    527 U.S. 263 (1999)..........................................................................................22

*Teague v. Scott*,
    60 F.3d 1167 (5th Cir. 1995) ...........................................................................21

*Toney v. Gammon*,
    79 F.3d 693 (8th Cir. 1996) .............................................................................21

*United States v. Weingraub*,
    871 F.2d 1257 (5th Cir. 1989) .........................................................................22

*Vasquez v. Hillery*,
    474 U.S. 254 (1986) ........................................................................................22

*Will v. Thaler*,
    No. H-07-CV-1000, 2012 WL 135590 (S.D. Tex. Jan. 17, 2012)........................13

*Wilson v. Butler*,
    825 F.2d 879 (5th Cir. 1987) .................................................................19, 20, 22

*Woodson v. North Carolina*,
    428 U.S. 280 (1976).........................................................................................22

**Statutes**

28 U.S.C. § 2244(b) ...............................................................................................11

Federal Rule of Civil Procedure 45 .............................................................1, 23, 34, 45

Habeas Rule 6 ............................................................................................... *passim*

**Other Authorities**

Advisory Committee Note to Former Rule 9(a) of the Rules Governing
Section 2254 Cases in the United States District Courts ...........................................20

BRIAN MEANS, FEDERAL HABEAS MANUAL § 9C:33 (2023 ed.) ...................................22

HERTZ & LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE & PROCEDURE,
7th ed. §19.4………..…………………………………………………………….20, 21-22

## INTRODUCTION

Petitioner Robert Gene Will, II ("Mr. Will") seeks leave, pursuant to Habeas Rule 6 and Federal Rule of Civil Procedure 45, to depose (i) certain Harris County District Attorney's Office ("HCDA") and Harris County Sheriff's Office ("HCSO") personnel who were involved in the investigation of Deputy Barrett Hill's murder and in Mr. Will's prosecution; (ii) former Harris County Jail inmates who heard another inmate confess to the murder for which Mr. Will has been condemned to die; (iii) the confessor himself, Michael Alan Rosario ("Rosario"); his mother, who knew her son was involved in Deputy Hill's murder before law enforcement did; and his father, former Houston Police Department ("HPD") Officer Miguel Rosario ("Rosario Sr."), who was granted special access to his son from day one of the investigation; and (iv) various other witnesses, identified herein, whose testimony is critical to Mr. Will's *Brady* claim.  Mr. Will also asks this Court to authorize service of subpoenas, pursuant to Habeas Rule 6 and Federal Rule of Civil Procedure 45, for documents held by the HCDA, HCSO, HPD, and various other law enforcement agencies and witnesses which are necessary to establish the State's suppression of evidence that would have exculpated Mr. Will, inculpated Rosario, and impeached the State's methods of investigation in this capital murder case.

By undertaking the discovery listed above, Mr. Will seeks to support pending allegations and evidence justifying his right to habeas corpus relief under *Brady v. Maryland*, 373 U.S. 83 (1963).

# I.
# <u>BACKGROUND</u>

Because this Court is well-acquainted with the factual background of this case, Mr. Will includes here only those facts relevant to the requested discovery and incorporates by reference the factual background contained in his *Second Amended Petition*, Dkt. 82.

### A. In the Early Morning of December 4, 2000, HCSO Deputy Barrett Hill and his Partner Respond to a Report of a Vehicle Break-in at an Apartment Complex, and Deputy Hill Is Shot and Killed During the Ensuing Chase of Two Suspects.

At approximately 6:16 a.m. on December 4, 2000, the HCSO received a report that several men were breaking into a vehicle at an apartment complex at 917 Dunson Glen. Trial Transcript (hereinafter "Tr.") Vol. 19 at 14. Deputies Barrett Hill and Warren Kelly responded to the call and encountered Mr. Will and Michael Rosario in a parking lot. *See id.* at 31, 34. As the deputies approached, Mr. Will and Rosario fled into a wooded field nearby. *Id.* at 35-36, 44; Tr. Vol. 21 at 48-50, 55. The deputies gave chase. Tr. Vol. 19 at 36-37; Tr. Vol. 21 at 48-52, 55-56. Deputy Hill chased Mr. Will directly into a wooded field through thick brush. *See* Tr. Vol. 21 at 49-52. Rosario ran through the same field by way of an overgrown concrete driveway. Tr. Vol. 19 at 43-44 (testimony of Deputy Kelly); Tr. Vol. 21 at 56 (testimony of Brenda Jones). From a distance Deputy Kelly attempted to follow Rosario but lost sight of him. Tr. Vol. 19 at 48. Deputy Kelly lagged behind Rosario, never getting close enough to see his face or even tell what he was wearing. Tr. Vol. 21 at 21-22.

Radio dispatches captured Deputy Hill reporting that he had Mr. Will "in custody." *See* Dkt. 82-10, Radio Transcript of Deputy Barrett Hill #4119 Shooting, at lns. 64, 72. Dispatches also recorded Deputy Hill's partner, Deputy Kelly, reporting that he had "lost" Rosario somewhere in the field. *See id.* at lns. 71-72. Gunshots are then heard on the tape. *Id.* at ln. 72. Mr. Will ran to a nearby apartment complex, where he stole a vehicle from Cassandra Simmons and fled the

2

scene.  Later that day, he was captured in Brenham without incident.

### B. Rosario Stays Near the Scene, Acting Erratically and Drawing the Suspicion of Other Witnesses.  Almost Immediately, He Begins to Leverage his Family's Law Enforcement Connections to Distance Himself from the Murder.

Around 8:15 a.m., Cheryl Kengerski, a resident of the apartments at 700 Dunson Glen, heard helicopters and stepped outside to see what was going on.  Tr. Vol. 26 at 37.  She saw a guy on her balcony wearing pants so light that she could see his dark underwear beneath.  *Id.* at 37-38.  He concerned her because of all the helicopters and police around the apartment complex.  *Id.* at 38.  He was acting "real edgy" and nervous.  *Id.*  She saw him unwrap a cigarette pack and throw the wrapper to the ground.  *Id.* at 38.  He then threw a few shadow-boxing punches, exited the complex, and made his way toward the officers in the field.  *Id.* at 39-40.  He walked straight toward them, raising his hands as he approached.  *Id.* at 40-41.  They exchanged a few words for less than a minute, and then he continued walking up the street.  *Id.*

Deputies John Garcia and J.P. Garner were the officers who encountered Rosario at the scene.  *Id.* at 61.  "[T]he guy kind of made a comment to us . . . [a]nd I said, Hey, Deputy Garner, look at that guy."  *Id.* at 62.  It was cold outside.  *Id.*  Rosario was wearing a dark-colored, long-sleeved sweatshirt with a white t-shirt over it and satin white sweatpants.  *Id.*  He was shivering, cold; he seemed nervous.  *Id.*  The deputies stopped Rosario and spoke to him for less than a minute before releasing him.  *Id.* at 63.

Rosa Carpenter, the assistant manager for an apartment complex near 700 Dunson Glen, testified that she arrived at work around 8:50 a.m.  *Id.* at 48.  There were police helicopters circling the area and she noticed a man sitting on the curb near the entrance to her office.  *Id.*  He seemed nervous and she thought it was unusual.  *Id.* at 49-50.  She asked him what was going on down the street.  *Id.* at 50.  He asked her for money, but she didn't give him any.  *Id.* at 51.  She quickly

went inside and saw him walk toward a fire exit at the back of the property. *Id.* at 52. Later, when

the police were surveying her whole complex, she told them what she saw. *Id.* at 53-54. She

signed a statement and identified Rosario from a photo spread as the suspicious man she saw sitting

on the curb. *Id.* at 54-55. She asked Rosario "what was going on with all of the police cars around,

and he said, 'A cop had got shot.'" *See* Dkt. 82-27 (Statement of Rosa Carpenter).

HCSO Deputy Doug Thomas received a call from Rosario's mother, Marie Rosario, at 9:30

a.m. *See* Dkt. 82-45 (4/30/01 Supp. Report of Deputy Thomas). At the time, Deputy Thomas was

working an approved extra job on Wednesday nights for Mrs. Rosario. *Id.* Deputy Thomas later

recounted the phone call in a supplemental report:

> Mrs. Rosario asked if I had any information about the deputy that had been killed
> earlier that day. I told Mrs. Rosario that I knew the deputy and that I did not go to
> the scene. Mrs. Rosario asked if I had information on the suspects. I told her the
> information that I was given on the radio. Mrs. Rosario asked if we had the names
> of the suspects and I told her no just the descriptions. She continued to asked [*sic*]
> if I had any additional information and I told [her] that I did not. At that time I
> asked Mrs. Rosario why was she worried about the suspects and that she should be
> more concerned about the deputy's family. She did not reply to that comment.
> Instead she asked if we knew the location of the suspect or if we had any of the
> suspects in custody. I stated to Mrs. Rosario that I did not know anything at that
> time. I ended the conversation. On December 5, 2001, at approximately 7:00 a.m.
> I was at my home preparing to go to work. I was watching the news on the
> television and saw that the Harris County Sheriff's Department had arrested a
> second suspect in the shooting death of Barry Hill. The news showed his picture
> and advised his name was Alan Rosario. At that time I realized the second suspect
> was Mrs. Rosario's son. . . . I signed on duty and called Mrs. Rosario at work. . . .
> I spoke with Mrs. Rosario and I told her that I was very upset with her. I told Mrs.
> Rosario that I thought at the time of our conversation the day of the shooting that
> she already knew her son was involved. I also told her that I felt she was just trying
> to get information to help her son. Mrs. Rosario did not reply. I told her that I
> could not believe her son was involved in the killing of a police officer since his
> dad was a Houston police officer. At that time she rep[l]ied "that Rob and Alan
> just went out to do a car and did not mean to hurt anybody." I stated to Mrs. Rosario
> "Well I guess you think that['] s ok."

*See id.*

Later that night, Rosario went to the Homicide Division and spoke with detectives. Rosario

began lying immediately. *See* Dkt. 82-26 (Det. Fikaris Supp. Report). His first lie was that he did not know Mr. Will. *Id.* at 1. Rosario then admitted knowing Mr. Will but told detectives that he was not at the crime scene on the night of the murder. *Id.* at 1-2. The detectives soon learned from other sources that Rosario was indeed at the crime scene. *Id.* at 2. Knowing Rosario was lying, Det. Fikaris read him his rights and continued to interview him. *Id.* at 2-3. Rosario then asked to speak with his father, a Houston police officer. *Id.* at 3.

Rosario was allowed to meet privately with his father. *Id.* Afterwards, he provided his first written statement. *See* Dkt. 82-21 (First Statement of Rosario). In that statement, Rosario finally admitted that he was at the scene, but pointed the finger at Mr. Will. *Id.* at 2. He said he and Mr. Will ran from the deputies, and "[r]ight before I got to a wood fence, I heard three quick gunshots. I looked back and I saw a flashlight go down, like someone dropped it. I jumped the fence and I ran into the front of the apartments . . . ." *See id.* He said he later encountered deputies at the scene, who "asked me where I was going and what my name was and I told them. They wrote it down and let me go." *Id.* at 3. He claimed he did not know that an officer had been shot until he returned to Mr. Will's apartment and Venegas "told [him] what happened."[1] *Id.* at 3.

In his 12:47 a.m. statement, Rosario also claimed to have seen the gun used to shoot Deputy Hill in Mr. Will's possession, but lied and said he had never touched it. *See id.* at 3. After likely realizing that his fingerprints or DNA might turn up on the murder weapon, Rosario changed his story again, telling the police in a second written statement that he had held the gun that night. *See* Dkt. 82-22 (Second Statement of Rosario), at 3.

Rosario was charged with auto theft and Mr. Will was charged with capital murder.

---

[1] This version of events is contradicted by Rosa Carpenter's description of Rosario's statements to her and by Mrs. Rosario's phone call to Deputy Thomas, both of which showed that Rosario knew early that morning that a police officer had been killed.

**C. At Trial, the State Portrays Rosario as a Distant Bystander to Deputy Hill's Murder, and Draws a False Contrast Between the "Desperation" of Mr. Will and the Innocent Behavior of Rosario *After* the Murder.**

No DNA or other forensic evidence identified Mr. Will as the shooter. *See, e.g.,* Tr. Vol. 17 at 155-56 (no latent fingerprints on murder weapon or casings); Tr. Vol. 24 at 114-18 (the only gunshot residue found on Mr. Will resulted from his own gunshot wound, not from firing a gun); *id.* at 31 (none of Deputy Hill's blood was found on Mr. Will); *id.* at 24-25, 32, 35-36 (only a speck of Mr. Will's blood was found on Deputy Hill). With no definitive evidence to prove Mr. Will's guilt at trial, the pervasive theme of the State's case was an argument about what happened *after* the shooting. The State drew a false contrast between Mr. Will's behavior and that of Rosario after Deputy Hill was murdered. The State argued that while Mr. Will was "desperate" to get away with a crime, Rosario had behaved like an innocent man. Tr. Vol. 26 at 150-52. The State painted Rosario as a distant bystander to Deputy Hill's murder:

> [W]e know what was really going on out there. We know that Michael Rosario gets away. . . . [T]he defense brought you evidence that Michael Rosario is out there east of the location. He's seen walking around, wearing the white wind pants and the dark shirt that his parents ultimately provided to the sheriff's department. He's sitting there and don't you know Michael Rosario had to wonder, he had to hear those gunshots, too, and he had to be wondering, gosh, is my buddy dead? Is he the one that's shot? What's going on?

*Id.* at 103-05 (closing statement by Assistant District Attorney Denise Nassar).

The defense bench-warranted four Harris County Jail inmates as possible trial witnesses to testify that Rosario had confessed to being the shooter: Scott Craig, Rene Gonzales, Richard Lucio, and Victor Coronado. Tr. Vol. 31 at 74. Craig, Gonzales, and Lucio refused to come out of their cells to testify. *Id.* at 75-77. Defense counsel met briefly with Gonzales, who told them that everything he said in a videotaped interview with the HCSO about incriminating statements Rosario made to him was a lie and that he was not going to testify. *Id.* at 75-76. Gonzales told

6

defense counsel that if they forced him to testify, he would say that Mr. Will told him he shot the

officer. *Id.* at 76.

Mr. Will was convicted of capital murder and sentenced to death on January 23, 2002.

**D. More Than Ten Years Later, the HCDA Discloses, for the First Time, Jail Records Indicating that Rosario Bragged About his Role in the Murder to a HCSO Deputy and Solicited a Hit on Mr. Will While They Were Housed in the Harris County Jail.**

In September 2012, the HCDA disclosed two never-before-seen documents that would

change the trajectory of this case. The first was an HCSO Administrative Separation Review Sheet

showing that Rosario was being held in a separate section of the Harris County Jail because he had

enlisted the Texas Syndicate prison gang to kill Mr. Will. *See* Dkt. 82-1 (Hit Document):

REASON FOR SEPARATION :

CO-DEF IN CAPITAL MURDER ⌀ CASE

CHARGED WITH THEFT      ✷ SEE LP13 ✷

MADE CONTACT W/DGU TO VISIT W/ DAVID CRUZ $
5B5-08
Soliciting $ TO MAKE HIT ON CO-DEF Robt. Will (GENE)

The second document was a report by HCSO Deputy Patricia Schifani. *See* Dkt. 82-7

(Schifani Report). According to her report, Deputy Schifani was returning Harris County jail

inmates, including Rosario, from court on December 7, 2000, three days after the murder. Rosario

looked directly at the mourning badge cover that Deputy Schifani had been wearing in honor of

Deputy Hill and said, "Do you know why you are wearing that? . . . I am part of the reason you

are wearing it, do you know who I am?" *Id.* Rosario then "pointed to his armband caution text

which indicated '*PROTECTION*'" and said, "I'm high-profile! Do you know who my father

is?" *Id.*

These two documents had never been disclosed to Mr. Will's trial counsel. *See* Dkt. 82-8

(Affidavit of Anthony Osso); Dkt. 82-9 (Affidavit of David Cunningham).

**E. In State Habeas Proceedings, the HCDA Sponsors Affidavits from Ms. Parsons and Deputy Strickland in Which They Denied Any Knowledge of the Schifani Report or a Hit Taken Out on Mr. Will.**

After the Hit Document and Schifani Report were uncovered, lead prosecutor Lynne Parsons signed an affidavit addressing the concealed documents, claiming:

> Prior to Will's capital murder trial, I had multiple discussions with trial counsel Osso and Cunningham regarding statements against interest that Rosario allegedly made to various Harris County Jail inmates, including Rene Gonzales and Scott Craig. I also recall having a pretrial discussion with Rosario's counsel, Christopher Downey, who alerted me that the defendant was engaged in an effort to manufacture statements from other inmates implicating Rosario in the capital murder of Deputy Hill. As a side note, Will's trial counsel subpoenaed inmates Craig, Gonzales, and Richard Lucio to testify at trial as to Rosario's alleged statements against interest, but they each refused to come out of their cells. . . . The transcripts of the pretrial motions reflect that I facilitated the discovery of, and turned over to trial counsel, various documents responsive to the defendant's subpoena for Harris County Sheriff's Office classification information. . . . *I have no recollection of seeing, or having knowledge of, Rosario's Separation Review Sheet [i.e., the Hit Document] or Deputy Shifani's [sic] memorandum, and I cannot explain how these documents are in the State's files today*.

*See* Dkt. 82-33 (Affidavit of Lynne W. Parsons), at 2 (emphasis added). Ms. Parsons conceded that she was obligated under *Brady* to turn the documents over to trial counsel "had I known of their existence." *Id.*

Deputy Strickland likewise signed an affidavit. *See* Dkt. 82-37 (Affidavit of Deputy Strickland). He admitted that he wrote the Hit Document but claimed any hit was pure "speculation" and did "not constitute actionable intelligence." *See id.* at 2. "Indeed, if I had actionable intelligence that Rosario, or any Harris County Jail inmate, was seeking gang assistance to kill another inmate, I would have documented that information in an intelligence report and not on a classification sheet." *Id.*

**F.  Mr. Will's Attempts at Further Factual Development Are Stymied by the State Trial Court.**

In light of the newly-discovered Hit Document and Schifani Report, Mr. Will's counsel asked this Court to stay these proceedings and hold them in abeyance so he could pursue new unexhausted claims in state court.  The Court granted the motion, and Mr. Will filed a third state application in the trial court (the "*Brady* Application") on August 26, 2013.  The State's answer relied heavily upon Ms. Parsons's and Deputy Strickland's affidavits.  *See* Dkt. 57-72 (*State's Original Answer* filed in state habeas proceeding on August 4, 2014), at 85-89.  The State deemed each affidavit "credible" and any failure by the State to disclose the Hit Document and Schifani Report "unintentional."  *See id.*  According to the State,

> [Mr. Will's] assertions that Rosario confessed to committing capital murder, and solicited assistance for a 'hit,' are not credible. . . .  In his credible affidavit, Strickland explains that Rosario never communicated a threat on the applicant and that his notation was based on speculation rather than actual intelligence.

*See id.* at 88-89.  The State dismissed an affidavit of David Cruz, the inmate mentioned in the Hit Document, as untruthful, claiming that "there is no evidentiary support for Cruz's extraordinary claims that Rosario confessed to capital murder and solicited help to commit another murder."  *Id.* at 96.  Regarding the Schifani Report, the State argued that "Will's claim of *Brady* favorability and materiality is premised on evidence of boasts and a pronouncement of 'being able to get away with anything' that do not exist."  *Id.* at 98.

Mr. Will twice moved for an evidentiary hearing in the trial court to fully develop the facts, but the trial court denied his requests and adopted verbatim the State's amended proposed findings of fact and conclusions of law.  The trial court denied the *Brady* Application without an evidentiary hearing on January 26, 2015.  On November 25, 2015, the Texas Court of Criminal Appeals ("TCCA") adopted the trial court's findings and conclusions with the exception of several related

to Mr. Will's *Brady* claim. The TCCA rejected the state court's conclusion that Mr. Will's new evidence was not favorable under *Brady* but adopted the lower court's analysis and legal conclusion that Mr. Will had not shown "by a preponderance of the evidence" that any single piece of undisclosed evidence was material. *See* Dkt. 82-38 (TCCA Order Denying Relief); Dkt. 82-39 (State Trial Court Findings of Fact, Conclusions of Law, and Order). All available state remedies for claims contained in the *Brady* Application were exhausted.

### G. Mr. Will Returns to Federal Court After Exhaustion, and the Fifth Circuit Authorizes the Successive Petition.

Mr. Will filed a successive petition in this Court on November 27, 2015. Dkt. 1. On September 25, 2017, this Court transferred the case to the Fifth Circuit Court of Appeals to determine whether this Court is authorized to adjudicate the successive petition. Dkt. 20. On August 5, 2020, the Fifth Circuit affirmed this Court's transfer order and authorized Mr. Will to proceed with his successive petition in this Court, finding that he had "made a prima facie showing that his *Brady* claim was not previously presented, that the evidence could not have been discovered through due diligence, and that his claim has merit." *In re Will*, 970 F.3d 536, 548 (5th Cir. 2020). Mr. Will filed a first amended petition on December 9, 2020. *See* Dkt. 37. Respondent filed a motion to dismiss on August 6, 2021. *See* Dkt. 42.

### H. Additional *Brady* Evidence is Disclosed by the HCDA on June 23, 2022.

On January 6, 2022, Mr. Will's counsel requested another review of the HCDA's casefile. The file review was held on February 28 and March 1, 2022. Pursuant to HCDA policy, and in the presence of Mr. Will's counsel, the assistant district attorney facilitating the review removed nearly a banker's box of documents from the file that appeared to the HCDA attorney to be confidential work product, and informed counsel that she would need to inspect those documents more closely to determine if they nevertheless had to be disclosed pursuant to *Brady* and/or *Giglio*

*v. United States*, 405 U.S. 150 (1972).  On June 23, 2022, the HCDA finished its review of the withheld "work product" and produced 250 pages of documents.  The production included prosecutors' notes and emails that had never been seen by the defense.  This evidence, hidden by the State of Texas notwithstanding its immediate relevance to the *Brady* claim that Mr. Will had been pressing since 2012, is described more fully below in Section II.

## I.   This Court Authorizes Mr. Will to File a Successive Petition.

On September 20, 2022, this Court requested supplemental briefing on what evidence the Court could consider, and how the Court could consider it, before deciding whether successive review was appropriate.  Dkt. 67 at 1-2.  On March 28, 2023, this Court denied Respondent's motion to dismiss and found that Mr. Will has met the legal standards of 28 U.S.C. § 2244(b) so that he can now "proceed to adjudication" of his *Brady* claim:  that Rosario was the one who shot Deputy Hill, and the State violated Mr. Will's due process rights under *Brady* by not disclosing evidence that implicates Rosario as the true killer.  *See* Dkt. 79 at 35.  The Court also granted Mr. Will's request to amend his petition and denied without prejudice a pending motion for discovery.  *Id.*

## J.   This Court Finds that the State-Court Decision Was Contrary to Federal Law and that Mr. Will's *Brady* Claim Is Entitled to *De Novo* Review.

Mr. Will filed an amended petition and supporting brief on June 13, 2023.  *See* Dkts. 82-83.  The brief addressed, among other issues, whether the state court unreasonably denied Mr. Will's claim that the State suppressed material contrary to *Brady*.  On April 3, 2024, this Court found that the state-court decision was contrary to federal law and determined that Mr. Will is entitled to *de novo* review of his *Brady* claim.  *See* Dkt. 94.  The Court directed Mr. Will to submit "a motion for discovery or evidentiary hearing which lists, with specificity, what material he wishes to discover and what testimony he seeks to present in any evidentiary hearing."  *Id.* at 25-

26.   The instant motion for discovery is being filed in accordance with the Court's order. Following any discovery and expansion of the record under Habeas Rule 7, Mr. Will intends to file a renewed motion for evidentiary hearing.

**II.**
**ADDITIONAL *BRADY* EVIDENCE DISCLOSED BY THE HCDA ON JUNE 23, 2022**

The evidence disclosed for the first time by the HCDA on June 23, 2022 included the following:

(1)    A note recounting a conversation with Deputy Garcia about his encounter with Rosario at the scene the morning of Deputy Hill's murder.  *See* Dkt. 82-49.  The note indicates that Rosario told Deputy Garcia "my dad is HPD."  *Id.*  This fact was omitted from Rosario's written statements, Dkts. 82-21, 82-22, and from both deputies' trial testimony and written reports.  *See* Dkt. 82-43 (12/5/00 Supp. Report of Deputy Garcia); Dkt. 82-44 (12/5/00 Supp. Report of Deputy Garner); Tr. Vol. 25 at 171-78 (Deputy Garner's testimony); Tr. Vol. 26 at 61-64 (Deputy Garcia's testimony).  Ms. Parsons specifically asked both deputies on the stand if Rosario had given them identifying information; they said he had but did not tell the jury that he'd said his dad was a police officer.  This could account for why the deputies so readily released Rosario from the scene despite his suspicious behavior.  And it bolsters Mr. Will's claim that the Schifani Report is favorable and material under *Brady*, because it corroborates the attitude described in that report that Rosario thought he was "able to get away with anything" because his dad was a cop.  *See* Dkt. 57-72 (*State's Original Answer* filed in state habeas proceeding on August 4, 2014), at 98.

(2)    September 22, 2001 typewritten notes of "Telephone Interview with Edward Charles."  *See* Dkt. 82-50.  Charles was a maintenance man at the apartment where Mr. Will lived with his girlfriend, Brenda Venegas.  Charles evidently informed law enforcement that Venegas told him, after the murder, that "she was not sure if Robert had killed the deputy because Rosario

had blood on his clothes and had washed them at her apartment that same morning." *Id.* Had the defense known about this statement, they could have used it to bolster the credibility of Natasha Helalian, Venegas's friend who was at her apartment that morning, who told police that Rosario "put on his white nylon windbreaker pants" and then remarked "[t]he blood came off of 'em." *See* Dkt. 82-25 (Statement of Natasha Helalian), at 2. The jury never heard this portion of Helalian's testimony because of the trial court's "curious[]" decision to sustain the State's hearsay objection. *See Will v. Thaler*, No. H-07-CV-1000, 2012 WL 135590, at *5, *10 (S.D. Tex. Jan. 17, 2012) ("[T]he trial court's exclusion of Helalian's testimony linking Rosario to the murder was almost certainly error of grave proportion."); *see also* Tr. Vol. 25 at 187-90. The withholding of the Charles notes under the guise of "work product" only compounded this "error of grave proportion."

(3)      September 20, 2001 Statement of Edward Charles. *See* Dkt. 82-51. The statement mentions that Charles had been interviewed by law enforcement right after the murder, in December 2000. The statement is significant for what it omits: any mention of Venegas telling Charles that Rosario had blood on his clothes and washed them at her apartment that same morning. In addition to exculpating Mr. Will, inculpating Rosario, and corroborating Helalian's statement, this statement casts heavy doubt on the State's method of investigation. It shows that law enforcement, whether intentionally or subconsciously,[2] was laser-focused on blaming the murder on Mr. Will instead of Rosario from the very beginning.

(4)      August 15, 2001 e-mail exchange between lead prosecutor Lynne Parsons and Det. Pinkins. *See* Dkt. 82-48. The e-mail says Ms. Parsons spoke with Mr. Will's trial counsel and

---

[2] Because how could the son of a police officer have killed another police officer? Unfortunately, it has happened before. On Father's Day in 2010, David Brown, Jr., the son of Dallas Police Chief David Brown, shot and killed a police officer and then died during a shootout with law enforcement. *See* https://www.nbcdfw.com/news/local/dallas-police-chief-talks-about-the-pain-of-his-sons-death/1873751/ (last accessed July 31, 2022).

> Will has reported that he has had several meetings with Stricklin [*sic*] in the jail. Will has told his lawyer that Stricklin [*sic*] has asked him about the shooting and his actions at the shooting. Will is sticking with the story that Rosario is the shooter. Apparently Will is under the impression from Stricklin [*sic*] that Stricklin [*sic*] has spoken with several jail inmates about admissions made by Rosario in HC Jail. What I need from you is Stricklin's [*sic*] complete report reflecting who [he] has spoken to and what they have said to him. Regardless of the veracity of these inmates, all of this is BRADY material that I must turn over to the defense. Please find out what you can.

*Id.* Detective Pinkins responded: "I will take care of Strickland ASAP." *Id.* This e-mail exchange confirms that Ms. Parsons knew Deputy Strickland had spoken with several inmates about Rosario confessing to the murder, and that she believed this constituted *Brady* evidence. Yet she did not reveal the extent of Deputy Strickland's inmate communications with the defense, as will be discussed *infra*.

(5) <u>Undated handwritten note with "Stricklin" at the top</u>. *See* Dkt. 82-47. The note says:

*Id.* The significance of this note cannot be overstated. *First*, it implicates Rosario in Deputy Hill's murder and exculpates Mr. Will. *Second*, it shows that the author of the note (presumably Ms. Parsons) knew that Deputy Strickland had interviewed <u>four</u> inmates—not two like she said at the September 6, 2001 pre-trial hearing, and not three like Deputy Strickland said at the September 11, 2001 pre-trial hearing. *See* Tr. Vol. 2 at 24; Tr. Vol. 3 at 16. *Third*, it shows that Ms. Parsons and Deputy Strickland knew that Mr. Will's trial counsel, Anthony Osso, was aware of only two of these inmates. *Fourth*, it reveals that Ms. Parsons and Deputy Strickland had knowledge of, and kept tabs on, an apparent "hit" out on Mr. Will. *Fifth*, it casts doubt on the veracity of the affidavits of Deputy Strickland and Ms. Parsons, which were sponsored, and heavily relied upon, by the HCDA in the state habeas proceeding. *Sixth*, it further confirms that Deputy Strickland

15

perjured himself at the September 11, 2001 pre-trial hearing, when he said he had nothing related to Mr. Will's case.

      (6)   <u>Undated handwritten note with "Rene Gonzalez" at the top</u>.  *See* Dkt. 59-9.  The note says:



*Id.*  Again, this note inculpates Rosario and exculpates Mr. Will.  Also, it shows that Gonzales relayed to Mr. Will what Rosario had told him and Mr. Will asked Gonzales to tell law enforcement, rather than Mr. Will concocting a story of Rosario being the shooter and soliciting other inmates to lie for him at his trial—which is what the State has always contended.  It also corroborates Gonzales's January 25, 2007 affidavit.  *See Will v. Quarterman*, No. 4:07-cv-01000 (S.D. Tex.), Dkt. 1 at 23-27.

      (7)   <u>8/21/01 handwritten note</u>.  *See* Dkt. 82-46.  The note states:

*Id.* The rest of the note is redacted.[3] This note is significant not only because it inculpates Rosario

in the murder of Deputy Hill, but also because it casts doubt on the veracity of HCSO Det. Gregory

Pinkins' trial testimony and Ms. Parsons's and Deputy Strickland's affidavits.  At trial, Det.

Pinkins had the following exchange with Mr. Will's trial counsel, David Cunningham:

> *Q (by Cunningham):  During the course of your investigation, did you become aware*
> *of admissions made by Michael Alan Rosario about his involvement in the shooting*
> *of Barry Hill?*
>
> *A (by Pinkins):  No.*
>
> *Q:  Sure?*
>
> *A:  Positive.*
>
> *Q:  Okay.  You never interviewed anyone over in the Harris County Jail with respect*
> *to that, did you?*
>
> *A:  Yes, I did.*

---

[3] Several of the documents produced by the HCDA on June 23, 2022, are partially redacted.  Mr.
Will requests that unredacted copies be produced.  *See Supplemental Briefing of Petitioner Robert
Gene Will, II,* being filed concurrently with the instant motion.

*Q: Okay. So, there had to be some sort of admissions that were brought to your attention about Mr. Rosario that you were looking into, correct?*

    *MS. PARSONS: Judge, I object. This is hearsay.*

    *THE COURT: Sustained.*

Tr. Vol. 22 at 45. This newly-discovered note establishes that Rosario did in fact put a hit on Mr. Will through the Texas Syndicate prison gang, and that Deputy Strickland, Det. Pinkins, and Ms. Parsons all knew about the hit before Mr. Will's trial. Yet the State concealed this fact from the defense and the trial court at the September 6 and 11, 2001 pre-trial hearings, throughout state habeas proceedings, and throughout federal habeas proceedings in this Court. *See, e.g.*, Dkt. 42 (*Motion to Dismiss with Brief in Support*). The State-sponsored affidavits of Ms. Parsons and Deputy Strickland directly contradict these prosecutor notes.[4] Had the defense known that the Texas Syndicate gang had put a hit out on Mr. Will, they could have used that to argue that Rosario was the actual shooter. *Cf. Peoples v. State*, 874 S.W.2d 804, 809 (Tex. App—Fort Worth 1994, pet. ref'd) ("[E]vidence that a witness has been threatened . . . is admissible to show the accused's 'consciousness of guilt.' Threats . . . are hardly the actions of an innocent [person], and evidence of such [threats] is every bit as probative of guilt as would be flight by the accused." (citations omitted)); *see generally Holmes v. South Carolina*, 547 U.S. 319 (2006) (holding that trial court's exclusion of defense evidence of third-party guilt violated the defendant's rights to a fair trial and to present a defense under Sixth and Fourteenth Amendments). Had the defense known about the hit solicitation, they could have also used that to explain to the jury why Gonzales (and other inmates) refused to testify at Mr. Will's trial. These inmates did not refuse to come out of their

---

[4] Notably, Ms. Parsons swore that before executing her affidavit, she had "reviewed the contents of the State's prosecution files as well as the transcripts of pretrial hearings . . . in Will's capital murder case." *See* Dkt. 82-33 (Parsons Affidavit), at 1.

cells and testify because Mr. Will lied and put them up to it; rather, they likely feared retaliation from the Texas Syndicate if they testified against Rosario.

In light of this newly discovered *Brady* evidence, which casts doubt on Mr. Will's guilt, on the veracity of the testimony of various State witnesses, and on the State's methods of investigation into the true perpetrator of Deputy Hill's murder, good cause exists to allow Mr. Will to invoke the processes of discovery available under the Federal Rules of Civil Procedure.

## III.
## MOTION FOR LEAVE TO CONDUCT DISCOVERY, INCLUDING DEPOSITIONS

### A.  Legal Standards Governing Fact Development Procedures in Section 2254 Cases

In 1976, the Supreme Court "promulgated and Congress adopted the Rules Governing § 2254 Cases." *See Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  Rule 6(a), among them, provides that:

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

In *Harris v. Nelson*, 394 U.S. 286 (1969), the Supreme Court explained what type of showing a petitioner needs to make in order to establish good cause.  According to the *Harris* court, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry."  *Id.* at 300; *see also Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000); *Wilson v. Butler*, 825 F.2d 879, 883 (5th Cir. 1987) ("[I]f [the death penalty] is involved, the petitioner should be presented every opportunity possible . . . to present facts relevant to his constitutional claims.").  Therefore, "in appropriate circumstances, a district court, confronted by a petition for habeas corpus which establishes a *prima facie* case for relief, may use or authorize the use of suitable discovery

procedures, including interrogatories, reasonably fashioned to elicit facts necessary to help the court to 'dispose of the matter as law and justice require.'" *Id.* (citing 28 U.S.C. § 2243). In authorizing Mr. Will to file a successive petition in this Court, the Fifth Circuit found that Mr. Will made a *prima facie* showing that his *Brady* claim has merit. *See In re Will,* 970 F.3d 536, 547-48 (5th Cir. 2020). After conducting an even deeper review of the facts and law, this Court determined that Mr. Will's *Brady* claim could pass through AEDPA's second gateway and proceed to adjudication. Dkt. 94.

But even if these determinations had not already been made by the Fifth Circuit and this Court, Rule 6 would nevertheless authorize the discovery that Mr. Will seeks here. This is because there are several ways in which Rule 6 authorizes wider discovery than *Harris.* Although language in *Harris* suggests that the petitioner might have to establish "a *prima facie* case for relief" as a prerequisite to discovery, Rule 6(a)'s "good cause" standard permits the use of discovery to *establish* a *prima facie* case for relief. *See, e.g.*, *Bracy*, 520 U.S. at 906-09 & n.10; *see also* HERTZ & LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE & PROCEDURE, 7th ed. § 19.4(c). Moreover, the Advisory Committee Notes to Rule 6 approve the use of discovery in appropriate cases *before* an evidentiary hearing has been granted, a possibility not contemplated in *Harris. See, e.g.*, *Jones v. Wood*, 114 F.3d 1002, 1008-09 (9th Cir. 1997). The Supreme Court's decision in *Blackledge v. Allison*, 431 U.S. 63 (1977), handed down at approximately the same time Rule 6 was adopted, supports the Advisory Committee's interpretation. The Advisory Committee has also pointed out that Rule 6 could be "used by the court to allow petitioner liberal discovery" to establish that his delay in filing the petition did not prejudice the state. *See* Advisory Committee Note to Former Rule 9(a) of the Rules Governing Section 2254 Cases in the United States District Courts. In addition to emphasizing the liberality of the discovery right contemplated by the drafters of the

Habeas Rules, this passage (1) confirmed that discovery is available not only to explore the petitioner's factual allegations but also to refute factual defenses asserted by the state, and (2) emphasized the availability of discovery to uncover factual information especially accessible to the state.  *See Bracy*, 520 U.S. at 902 & n.3, 909 (1997) (denial of petitioner's request for discovery of nonpublic documents in state's possession was abuse of discretion); *Coleman v. Zant*, 708 F.2d 541, 547-48 (11th Cir. 1983) (discovery permitted to assist petitioner in showing that state court factfindings were not adequate).  In short, a petitioner who has (1) made specific allegations warranting relief, (2) shown why the requested information is essential to the adequate factual development of his claims, and (3) demonstrated that the requested information is likely in the hands of the party or agency from whom discovery is sought and cannot be obtained through other means, has established "good cause" under *Bracy* and Habeas Rule 6.  *See Murphy*, 205 F.3d at 813-14; *East v. Scott*, 55 F.3d 996, 1001 (5th Cir. 1995) (although a "district court generally has discretion to grant or deny discovery requests under Rule 6, a court's blanket denial of discovery is an abuse of discretion if discovery is indispensable to a fair, rounded development of the material facts") (quoting Commentary to Habeas Rule 6), granting relief after discovery, *East v. Johnson*, 123 F.3d 235 (5th Cir. 1997); *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995); *Toney v. Gammon*, 79 F.3d 693, 700 (8th Cir. 1996) (petitioner entitled to discovery of physical evidence to establish constitutional claims).

Rule 6 therefore warrants discovery "when[ever] it would help the court make a reliable determination with respect to the petitioner's claim." *Herrera v. Collins*, 506 U.S. 390, 444 (1993) (Blackmun, J., dissenting on other grounds).  Discovery may be particularly useful in establishing out-of-court misconduct by law enforcement personnel, for example, prosecutorial suppression of exculpatory evidence or presentation of false inculpatory evidence.  *See* HERTZ & LIEBMAN,

§ 19.4[a], n.4; *Strickler v. Greene*, 527 U.S. 263, 278 (1999) (district court's grant of discovery of "all of the police and prosecution files in the case" led to counsel's uncovering prior inconsistent statements by key witnesses that were suppressed by prosecution); *United States v. Weingraub*, 871 F.2d 1257, 1259 (5th Cir. 1989) (discovery revealed prosecutorial suppression of evidence). Discovery would also serve judicial economy. Once discovery is completed, Mr. Will intends to renew his request for an evidentiary hearing. Pre-hearing discovery could (1) determine whether it is necessary for out-of-town witnesses to appear at a hearing at court expense, (2) minimize the possibility of surprise at or inadequate preparation for hearings, thereby preventing delays and continuances, and/or (3) assist in resolving defenses asserted by the State.

The policies favoring discovery are even stronger in capital cases because the "finality" of death and its "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnifies the "need for reliability" and, accordingly, the need for reliable fact-determination procedures. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *McFarland v. Scott*, 512 U.S. 849, 855 (1994). Because this is a death penalty case, broad discovery is necessary to ensure that extra measure of process which is demanded in capital cases. *See Wilson*, 825 F.2d at 883 ("[I]f death is involved, the petitioner should be presented every opportunity possible . . . to present facts relevant to his constitutional claims.").

Moreover, the facts adduced in discovery discussed below would merely provide "more and stronger" evidence of the *Brady* claim Mr. Will exhausted in state court; they would not "fundamentally alter" that claim. *See Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *Anderson v. Johnson*, 338 F.3d 382, 386-87 (5th Cir. 2003); *see also* BRIAN MEANS, FEDERAL HABEAS MANUAL, § 9C:33 (2023 ed.) ("The presentation of additional facts in the federal petition (or in a federal proceeding) does not evade the exhaustion requirement when the prisoner has presented

22

the substance of his claim to the state courts, and the supplemental evidence does not fundamentally alter the legal claim they considered.").

### B. Depositions of Witnesses Under Habeas Rule 6 and Federal Rule of Civil Procedure 45 Are Justified in Light of Recent Developments and Disclosures Exculpating Mr. Will, Implicating Rosario, and Impeaching the State's Methods of Investigation.

#### 1. Good Cause Exists to Depose Former and Current HCDA and HCSO Personnel.

The "good cause" threshold needed to obtain discovery via depositions of members of the prosecution team (Lynne Parsons, Denise Nassar, Chuck Rosenthal, and HCDA Investigators Michael Conner and John Harrison) and the HCSO (Deputies Robert Strickland, Tony Richards, M. Squyres, Doug Thomas, J.P. Garner, John A. Garcia, and Patricia Schifani; Detectives Gregory Pinkins, Wayne Kuhlman, and Dean Holtke; Lieutenant Gerald Moore; and Captain Lanny Hitchcock) is readily met. These individuals are very likely to have information calculated to augment and supplement Mr. Will's *Brady* claim. Despite specific requests, subpoenas, and pre-trial orders that should have led to production of the Hit Document, the Schifani Report, and the additional *Brady* materials produced in 2022, none of those documents had ever been disclosed to Mr. Will's counsel. Mr. Will deserves the opportunity to inquire into why that evidence was suppressed for so long and what other exculpatory evidence might still be suppressed.

The newly discovered evidence shows that (i) Rosario had sought to have the notorious Texas Syndicate prison gang kill Mr. Will, (ii) Harris County Jail personnel were aware of the hit that Rosario solicited, (iii) jail personnel notified the HCSO detective investigating the murder of Deputy Hill that Rosario had put a hit out on Mr. Will, and (iv) the HCSO detective passed this information along to the lead prosecutor weeks before Mr. Will's trial. The evidence produced in 2022, combined with the pre-trial hearing transcripts, shows that the prosecutor and the HCSO

23

sought to actively conceal from Mr. Will's counsel the full extent of the inmate interviews conducted by the HCSO Disruptive Gangs Unit ("DGU"). To fully develop his *Brady* claim, Mr. Will needs to investigate which jail inmates heard Rosario confess, the specific details of those confessions, whether the inmates informed the DGU of those confessions, and whether and when the DGU passed all of this information along to the prosecutor. Mr. Will also needs to inquire into whether and how the prosecutor and the DGU worked in tandem to obtain information from inmates that would inculpate Mr. Will while actively trying to conceal evidence that would inculpate Rosario and exculpate Mr. Will. To fully develop his *Brady* claim, Mr. Will needs to depose HCDA and HCSO personnel to flesh out what actions they took, either consciously or subconsciously, to protect Rosario in light of his father's status as a police officer.

>    **2.  Good Cause Exists to Depose Former Harris County Jail Inmates Rene Gonzales, Scott Craig, Victor Coronado, Richard Lucio, David Cruz, and Anthony Riojas.**

Good cause likewise exists for the depositions of former Harris County Jail inmates Gonzales, Craig, Coronado, Lucio, Cruz, and Riojas (the "Informants"), who heard Rosario confess to the shooting and/or knew of the hit placed on Mr. Will by Rosario. The recent HCDA production further confirms that these former Harris County Jail inmates have information that could augment and supplement Mr. Will's *Brady* claim. Some or all of these Informants evidently heard Rosario confess to the murder of Deputy Hill, knew that he had called on the Texas Syndicate to execute Mr. Will, and informed the HCSO DGU about Rosario's confessions and threats. To fully develop his *Brady* claim, Mr. Will needs to inquire into the extent of what each inmate knew; exactly what they told the DGU and when; what their motives were for passing along this information; whether they were threatened by Rosario, the Texas Syndicate, or anyone else for coming forward; and the reasons why they ultimately refused to testify at Mr. Will's trial. Mr.

Will also needs to investigate whether any of these inmates communicated directly with law enforcement or the prosecution team and whether they were offered or received any benefits for assisting the State in Mr. Will's prosecution (including by refusing to testify at trial).

Mr. Will's counsel has learned that, two months before Mr. Will's trial, Rene Gonzales filed an application to subpoena Ms. Parsons and Deputy Strickland to testify on his behalf in his aggravated robbery case. *See* Dkt. 59-11 (10/23/01 Application for Subpoena filed in *State v. Gonzales*, Cause No. 857350, in the 339th District of Harris County). This discovery, combined with the June 2022 disclosure of the prosecutor's notes about her conversation with Gonzales, give Mr. Will reason to believe that Gonzales might have received some sort of benefit for assisting the State in Mr. Will's prosecution. Mr. Will deserves an opportunity to develop these facts further and to inquire into any benefits the Informants might have received from the DGU and/or the HCDA as a result of their involvement or refusal to testify. Depositions of these inmates are also reasonably necessary for Mr. Will to further substantiate and augment the evidence he has already presented showing that the State misled the defense, court, and jury concerning the frequency and nature of the contacts between the State and the prison inmates.

### 3. Good Cause Exists to Depose Rosario, His Father, and His Mother.

Good cause also exists to depose Michael Rosario, his father Miguel Rosario, Sr., and his mother Marie Rosario. At the time of Deputy Hill's murder, the younger Rosario already had an extensive rap sheet of violent crimes in the Houston area. His father, Rosario Sr., was a Houston police officer. Despite his status as a repeat violent offender, Rosario curiously escaped any meaningful jail time for crimes he committed prior to Deputy Hill's murder and managed to be charged only with theft for his involvement on December 4, 2000, rather than with the capital murder of a police officer. His mother knew that her son was involved in the killing of Deputy

Hill before the authorities did, as evidenced by Deputy Thomas's supplemental report. *See* Dkt. 82-45 (4/30/01 Supp. Report of Deputy Thomas). Rosario Sr. was allowed to speak with his son privately at the police station before his son gave a statement to law enforcement on December 4, 2000. From the beginning, the State has significantly downplayed the younger Rosario's involvement in Deputy Hill's murder, painting him as a cooperative and credible witness whose parents, also credible, voluntarily handed over to police the clothing their son supposedly wore on the morning of the shooting. *See* Tr. Vol. 22 at 29-31 (testimony of Det. Pinkins); Dkt. 57-72 at 75 (*State's Original Answer* filed in state habeas proceeding on August 4, 2014).

Because of Rosario Sr.'s unique status as a police officer in the very jurisdiction in which Deputy Hill was killed, his connection to what happened after Deputy Hill's murder was not only familial, but also as an arm of law enforcement. Yet the State has never produced any notes or reports of Rosario Sr.'s involvement in the case. To fully flesh out his *Brady* claim, Mr. Will should be allowed to depose Rosario, his father, and his mother, to determine what they knew about their son's actions before, during, and after Deputy Hill's murder; what actions they took to protect him; and whether those actions were known to the HCSO, the HPD, and/or the prosecutor. Mr. Will also needs to question Rosario Sr. about any involvement he had in previous criminal charges against his son being reduced or dismissed, to corroborate the numerous statements Rosario has made to the effect that he could get away with anything because his dad was a police officer—a critical component to Mr. Will's *Brady* claim. The State has a duty to disclose favorable, material evidence not only in the hands of prosecutors, but also in the possession of agencies—such as the HCSO and the HPD—involved in investigating and assembling the State's case. *Kyles v. Whitley*, 514 U.S. 419, 421 (1995) (holding that the prosecutor remains responsible for producing *Brady* material "regardless of any failure by the police to bring favorable evidence

to the prosecution's attention").

### 4. Good Cause Exists to Depose Cassandra Simmons and Christopher Alexander.

Cassandra Simmons and Christopher Alexander are critical witnesses to Mr. Will's *Brady* claim, i.e., that Rosario was the one who shot Deputy Hill, and the State violated Mr. Will's due process rights under *Brady* by not disclosing evidence that implicates Rosario as the true killer. This Court has specifically found that "the suppression of evidence surrounding Ms. Simmons' testimony is properly encompassed within the scope of Will's *Brady* claim." *See* Dkt. 79 at 19. After Deputy Hill was shot, Mr. Will ran to a nearby parking lot where Simmons was sitting in her car. Simmons testified at trial that Mr. Will opened her car door, ordered her to get out, put a gun to her neck, and said "he had just shot a policeman." Tr. Vol. 21 at 74-75. Yet Simmons failed to mention this alarming admission to police. Moreover, Christopher Alexander, her neighbor who overheard the altercation, told HCSO deputies canvassing the scene that he heard the man say, "Get out of the car now!"; he did not mention anything about the man saying he had shot a policeman. *See* Dkt. 82-29 (Det. Ron Hunter Supp. Report), at 2. As defense counsel elicited on cross-examination, Simmons discussed the events of December 4, 2000, with at least eight separate law enforcement officials on the day of the shooting, *see* Tr. Vol. 21 at 104, *but did not tell a single officer that Mr. Will claimed to have shot a policeman*:

- When Simmons called 911 after her car was stolen, she did not tell the 911 operator that the individual who had taken her car told her that he had shot a police officer. Tr. Vol. 21 at 91.

- Simmons did not tell Deputy Kelly, the first officer on the scene, that Mr. Will had said he'd shot a police officer. *See id.* at 92-93.

- At 8:37 a.m. the morning of the shooting, Simmons spoke with Deputy Edwin Thomas and gave him a description of the person who took her car. She did not tell Deputy Thomas that this person said he had shot a police officer. *Id.* at 93-95.

- Police then bagged Simmons' hands. By this time, Simmons was aware that an officer had been killed in the field near her apartment. Again, she did not tell the officer bagging her hands that Mr. Will had said he had shot anyone. *Id.* at 95.

- Another officer came to collect blood from Simmons. She said nothing to this officer about Mr. Will's alleged statement. *Id.* at 95-96.

- Simmons then spoke with a police photographer. Simmons was now aware that there was a "murder investigation going on involving the death of a police officer" and she had also "figured out that [her] car ha[d] some connection to the[] investigation." But again, she did not mention Mr. Will's alleged statement. *Id.* at 96.

- An officer drove Simmons to the detectives' bureau, where she met with Deputy Fred Barnes at approximately 9:45 a.m. At 10:15 a.m., Simmons signed a written statement about what had happened to her that morning. Her statement did not include Mr. Will's alleged admission that he had just shot a police officer. *Id.* at 96-99, 101.

- Around 4:00 p.m. that same day, Simmons met with Lieutenant David and another deputy sheriff. *Id.* at 103. The officers showed Simmons pictures of Mr. Will; again, she said nothing about Mr. Will stating that he shot a police officer. *Id.* at 104.

Simmons testified that she did not tell law enforcement about Mr. Will's supposed admission until she told prosecutor Parsons at a meeting on September 5, 2001. *See id.* at 108. Prior to that meeting, prosecutors had obtained a video taken in the days after the shooting in which Simmons told a news crew about Mr. Will's alleged admission. *See* Dkt. 82-33 (Parsons Affidavit). Ms. Parsons learned of the news story and went to meet Simmons to discuss her trial testimony. At that interview, Ms. Parsons showed Simmons "gruesome" and "extremely graphic" pictures of the slain deputy that "did not relate to [Ms. Simmons'] proposed testimony."[5] Dkt. 82-32 (Affidavit of Cassandra Simmons). Simmons was accompanied to the interview by James Watson, her then-boyfriend. *See id.* Watson has sworn in an affidavit that prosecutors showed Simmons these "very gruesome and extremely graphic" photographs before she testified about Mr. Will's alleged admission. *See* Dkt. 82-28 (Affidavit of James Watson).

---

[5] In her affidavit, Ms. Parsons did not deny that the State showed Simmons those photos, only that "there was no reason to show Simmons photographs of Deputy Hill's body." *See* Dkt. 82-33 at 3.

Simmons' testimony was no doubt critical to the State's conviction of Mr. Will, but she has repeatedly waffled on whether Mr. Will actually confessed and if so, when she first told law enforcement about the confession. Mr. Will needs to depose Simmons so the Court can evaluate the credibility of her memory on this issue, which very well may have been influenced by the prosecution's pressure campaign involving the use of inflammatory photographs. Mr. Will also needs to depose Simmons in order to inquire into her allegation, contained in her September 14, 2014 affidavit, that one of the detectives told her "that the other person who was arrested with Mr. Will threatened to harm me and my family if I testified at trial." Dkt. 82-32 (Simmons Affidavit). Presumably, this "other person" is Rosario. Mr. Will needs to question Simmons as to whether and how her trial testimony was affected by this threat.

**5. Good Cause Exists to Depose Marshall Greenlee and Yvonne Greenlee.**

Marshall Greenlee was a criminal acquaintance of Rosario and Mr. Will who lived with his then-wife, Yvonne Greenlee, at the same apartment complex as Simmons, 911 Sun Prairie. Documents and audio recordings disclosed by the HCDA in 2022, when viewed in the context of a criminal case that Marshall was charged with shortly after Deputy Hill's murder, indicate that the HCDA likely cut a deal with Marshall in that case as a result of his and/or his wife's assistance in the prosecution of Mr. Will. Several weeks after the murder, on January 10, 2001, the police, acting on a tip, arrested Marshall for driving a stolen car. *See* Dkt. 59-12 (HCSO Detail Report), at 4. He and his attorney arranged an interview with prosecutor Parsons on March 8, 2001, the evident purpose of which was to give Ms. Parsons dirt on Mr. Will in exchange for some sort of benefit.[6] HCSO Detectives Pinkins and Kuhlman, HCDA Investigator Mike Connor, and Marshall's attorney were also present. At the beginning of the recorded conversation, Ms. Parsons

---

[6] This interview has not been transcribed, but a copy of the audio recording has been submitted to the Court and to Respondent. *See* Dkt. 59, Audio Exhibits A, B, C.

broached the topic of a possible *quid pro quo*:

> *MS. PARSONS:  You know that there are no deals between your lawyer and myself or you at this point.*
>
> *MARSHALL:  I'm aware of that.*
>
> *MS. PARSONS:  We had a court date set I think on the 15th to go back before Judge Poe in the 228th.  Whether we have a deal cut at that point, we don't know.  At this time it is conversation, is that correct?*
>
> *MARSHALL:  That's right.*
>
> *MS. PARSONS:  At this point, what I want to find out is exactly what additional – what information you want to give to us, and what is it you know about Robert Gene Will that you think we might be interested in ... with him sitting and facing a capital murder charge.*

*See* Dkt. 59, Audio Exhibit A (Marshall Greenlee Interview, Tape 1, Side A, 4:16).  During the interview, Marshall blamed his auto theft charge on Mr. Will.  Marshall said he did not steal the car; rather, Mr. Will confiscated it while working for a repo company and told Marshall he could use it.  Shortly afterward, Deputy Hill was killed.  Marshall said the car stayed at his place and every now and then he'd drive it.  Marshall was vague and evasive throughout the interview, making a point to distance himself from criminal activity while painting Mr. Will as a gun-toting career offender.  At the end of the interview, he told Ms. Parsons "my head's so scrambled up right now" because "right now I'm just worried about different things.  I'm worried about . . . I'll probably get out of jail on Saturday and then I gotta go back to work, make money to pay my lawyer, . . . then I have to go to this other case and see what's going on with it, and at the same time my wife's pulling her hair out, she's all nervous for me.  Those things are mostly on my mind.  My wife and my job.  And my freedom.  Those [] are the most important things to me right now."  Dkt. 59, Audio Exhibit C (Marshall Greenlee Interview, at Tape 2, Side A, at 12:33).  Ms. Parsons then asked Marshall if he made any of his story up.  Marshall replied, "No, . . . I'm not gonna lie

about anything to you.  I know that, you know, you have a chance to help me if you can, and if I

have a chance to help y'all I'll do it, but I'm not gonna sit up here and waste your time."  *Id.* at

13:11.

Thirteen days later, on March 21, 2001, Marshall filed, and Ms. Parsons approved, a

Motion and Agreement for Pre-Trial Intervention in his auto theft case.  *See* Dkt. 59-13.[7]  In the

motion, Marshall agreed that he would "make myself available to testify and will testify truthfully

in any proceeding conducted in the case styled The State of Texas vs. Robert Gene Will II, in

Cause Number 862715 pending in the 185th District Court of Harris County, Texas."  *Id.*  On

September 21, 2001, the court issued an order revoking his pre-trial diversion after Marshall

burglarized a coin-operated machine.  *See* Dkt. 59-15.  His bond was revoked and he was remanded

into custody.  On October 1, 2001, Yvonne called Ms. Parsons to tell her that Marshall was back

in custody.  *See* Dkt. 59-16.[8]  On November 15, 2001, Marshall was given only two years deferred

adjudication in his auto theft case.  *See* Dkt. 59-17.  A few weeks later, Yvonne testified at Will's

capital murder trial.  The timing cannot be coincidental.  Marshall's negligible sentence for the

auto theft likely reflects a deal that he was given in exchange for his and/or his wife's assistance

---

[7]  *See also* Dkt. 59-14, which contains documents produced by the HCDA on July 19, 2022, pursuant to a PIA request for Marshall's casefile.  The first page of Dkt. 59-14 is the file cover for Marshall's auto theft case.  A notation on the bottom right corner of that page appears to say: "Lynne Parsons says hold off on plea – [Defendant] witness in capital murder."  *Id.* at 1.  The second page is a March 21, 2001 e-mail from Ms. Parsons to Vanessa Velasquez, the HCDA attorney prosecuting Marshall, informing her that Marshall had entered into a contract for pre-trial intervention on that day for a term of one year, and "[a]s soon as the Capital Murder trial involving the defendant Robert Will is over, I will follow up on the contract terms with regard to Greenlee." *See id.* at 2.  The last two pages consist of April 12, 2001 correspondence between Ms. Parsons and the Harris County Community Supervision and Corrections Department, stating that "[t]he Capital Murder trial in which Greenlee will testify is scheduled to begin October 8, 2001."  *See id.* at 3-4.

[8]  This missed call memo was produced as part of the HCDA's "work product" production on June 23, 2022.

in Mr. Will's prosecution. Good cause exists to allow Mr. Will to depose Marshall and Yvonne (and Ms. Parsons) to determine if, in fact, such a deal was made and concealed from the defense. Good cause also exists for Mr. Will to depose Marshall Greenlee to determine what he knew about Rosario's actions on the day of the murder.

Mr. Will also deserves the opportunity to question Marshall and Yvonne concerning Marshall's statements, in the Parsons interview, about Cassandra Simmons. During the interview, Marshall described an encounter that he and Yvonne had with Simmons immediately after Mr. Will stole her car in the parking lot:

> [O]ne thing that doesn't make sense to us is when we got there that morning from getting groceries, the black woman came up to us and we asked what's going on, are you alright, and she looked like a mess, and she was like, yeah they just took my car. . . And it didn't make sense to us because we heard the statement she gave the sheriff was that she said the guy that took her car said hey, I just shot the, you know, I just shot the sheriff, give me your car. That's what we had heard. And so we were wondering why didn't that lady tell us that this guy had shot a sheriff? You know, we didn't even know the sheriff had got shot until later on that morning when my neighbor told us. But why didn't she tell us *that*, you know, and just say someone . . . put a gun to my head and took my car? When she told the sheriff that the guy put the gun to her head and said get out of your car, I just shot a sheriff. . . That didn't make sense to us. So we were thinking, . . . maybe Rob didn't do it, and he just carjacked a lady, and Rocky did it. . . . About ten minutes ago, me and my wife just get there and she [Simmons] is freaking out outside and she didn't say nothing about a sheriff to us. . . That's the only thing that made me kind of really wonder [if] it might have been Rocky. . . I don't know. I don't know who it was.

*See* Dkt. 59, Audio Exhibit B (Marshall Greenlee Interview, Tape 1, Side B, at 29:26) (emphasis in original). Mr. Will deserves an opportunity to depose Marshall Greenlee and Yvonne Greenlee to further flesh out this conversation they had with Simmons.

### 6. Good Cause Exists to Depose Gerald Cormier, Jr., Gerald Cormier, Sr., Cory Moore, and Pia Koehler.

Gerald "Rusty" Cormier, Jr. and Cory Moore were acquaintances of Mr. Will. They were roommates at an apartment complex near Dunson Glen. Pia Koehler was Cormier, Jr.'s girlfriend.

Ms. Parsons interviewed Cormier, Jr. on May 7, 2001.[9]  Also present at the interview were Detectives Pinkins and Kuhlman, HCDA Investigator Mike Connor, and Cormier, Jr.'s attorney. Cormier, Jr. told Ms. Parsons he woke up at Koehler's apartment the morning of December 4, 2000.  He said Moore called him and said that Rosario had come banging on their door earlier that morning.  Moore said he did not open the door because he did not like Rosario.  The banging on the door happened when Moore was getting ready for work that morning, and he had to be at work (which was right across from the apartment) at 7:00 a.m.  This means Rosario must have run to Moore and Cormier, Jr.'s apartment immediately after the shooting of Deputy Hill.

Cormier, Jr. told Ms. Parsons that he called his father the day of the murder and told him what had happened.  His father, Gerald Cormier, Sr., is (or was) an officer with the Houston Police Department.  His mother, Cindy Burney, is (or was) an HPD officer also.  Documents produced by the HCDA show that the prosecutor sought to obtain Cormier, Jr.'s cooperation in the investigation by going through his parents.  *See* Dkt. 59-18 (4/10/01 e-mail from Ms. Parsons to HCDA Investigator Connor).  However, Mr. Will's counsel have yet to see any notes or reports of what Cormier, Jr. told his parents about Mr. Will or Rosario or the events of December 4, 2000. Good cause exists for Mr. Will to depose Cormier, Jr., his girlfriend, his parents, and his roommate, to inquire into (1) what each knew of Rosario's actions the morning of December 4, 2000; (2) what they told law enforcement and when; and (3) whether any of them had been pressured, either by the Rosarios or law enforcement, against implicating Rosario, the son of an HPD officer, in the murder of Deputy Hill.

---

[9] This interview has not been transcribed, but a copy of the audio recording has been submitted to the Court and Respondent.  *See* Dkt. 59, Audio Exhibits D and E.

### C. Good Cause Exists to Authorize Service of Subpoenas, Pursuant to Habeas Rule 6 and Federal Rule of Civil Procedure 45, for Documents Held by the HCDA, HCSO, HPD, and Other Law Enforcement Agencies and Witnesses Which Are Necessary to Establish the State's Suppression of Exculpatory Evidence.

Mr. Will seeks leave to conduct discovery to ensure that he has been provided with all *Brady* evidence in his case. Specifically, Mr. Will seeks an order for production of, or an authorization to subpoena, the following records:

(1)     From the HCDA, the HCSO, the HPD, and any other entity or individual acting on the State's behalf in the investigation and/or prosecution of Mr. Will,[10] any and all documents, correspondence, or records of any kind, whether in hard copy or electronic form, concerning Mr. Will, Rosario, and/or the murder of Deputy Hill. This request includes, but is not limited to, any and all personal files that may have been maintained by any current or former employee of the HCDA, HCSO, HPD, or any other State actor (including, but not limited to, former HCDA prosecutors Lynne Parsons, Denise Nassar, and Charles Rosenthal; HCDA investigators Michael Connor and John Harrison; HCSO Deputies Robert Strickland, Tony Richards, M. Squyres, James Dalrymple, Doug Thomas, Tracy Shipley, J.P. Garner, John A. Garcia, and Patricia Schifani; HCSO Detectives Gregory Pinkins, Larry Davis, Wayne Kuhlman, Dean Holtke, Harry Fikaris, Ron Hunter, and David Ferrell; HCSO Sergeant V. Russell; HCSO Lieutenants Gerald Moore and R. Ricks; HCSO Captain Lanny Hitchcock; HCSO forensic examiner Matthew

---

[10]  In order to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf on the case, including the police." *Kyles,* 514 U.S. at 437. Consequently, this motion for discovery is meant to be all-inclusive. Any and all discovery requests are meant to be directed not only to the HCDA, but also to any of its individual employees, former employees, and any other individuals or entities that assisted in the investigation or prosecution of Mr. Will.

Clements; and HPD Officers Miguel Rosario, Gerald Cormier, Sr., and Cindy

Burney), whether maintained at the HCDA, the HCSO, the HPD, or offsite (at a

home or other address).[11]  This request also specifically includes:

(a)     all records pertaining to the investigation of HCSO Incident No.
        0012040292;

(b)     the indices for the HCDA, HCSO, and HPD files;

(c)     the HCSO's "original case file" concerning the murder of Deputy
        Hill;

(d)     any and all notes made by the aforementioned individuals or any
        other individual or entity acting on the State's behalf;

(e)     all statements, interviews, reports, correspondence, documents,
        notes, or records of any kind generated by or concerning any
        investigator, expert, or other witness, even if such witness did not
        testify at Mr. Will's trial;

(f)     all grand jury records, including, but not limited to, subpoenas,
        witness lists, and transcripts of testimony, related to Mr. Will's
        capital murder case;

(g)     all grand jury records, including, but not limited to, subpoenas,
        witness lists, and transcripts of testimony, related to *State v. Michael
        Alan Rosario*, Cause No. 862997, in the 185th District Court of
        Harris County (230th Grand Jury, Vol. 235, page 272, DA Log

---

[11]  Keeping in mind the recent case of Alfred Brown, who was released from death row in June
2015 after exculpatory evidence was found in a Houston homicide investigator's garage.

Number 648452, DA No. 67281100);

(h)    the in-store security VHS videotape from the Stop-N-Go located at 14121 Ella Boulevard, which was given to Harris County Pct. 5 Constable Sgt. J.J. Laine and turned over to HCSO Detective Johnson (referenced in Det. Johnson's December 13, 2000 supplemental report, Dkt. 82-19);

(i)    the videotape of a pre-trial interview between Detective Pinkins and Rene Gonzales, referenced at Tr. Vol. 31 at 74.

(2)    From the HCDA, any and all emails sent or received by any attorney (including, but not limited to, Lynne Parsons, Denise Nassar, and Charles Rosenthal), paralegal, investigator (including, but not limited to, Michael Connor and John Harrison), court reporter, or other employee of the HCDA concerning the murder of Deputy Hill, Mr. Will's case, Michael Rosario, and/or any Harris County Jail inmate involved in the investigation or prosecution of Mr. Will and/or Michael Alan Rosario, from December 4, 2000, through the present. This request includes all emails stored electronically.

(3)    From the HCSO, any and all emails sent or received by any HCSO employee (including, but not limited to, Deputies Robert Strickland, Tony Richards, M. Squyres, James Dalrymple, Doug Thomas, James Parker, Tracy Shipley, J.P. Garner, John A. Garcia, and Patricia Schifani; Detectives Gregory Pinkins, Larry Davis, Wayne Kuhlman, Dean Holtke, Harry Fikaris, Ron Hunter, and David Ferrell; Sergeant V. Russell; Lieutenants Gerald Moore and R. Ricks; Captain Lanny Hitchcock; and forensic examiner Matthew Clements) concerning the

murder of Deputy Hill, Mr. Will's case, Michael Rosario, and/or any of the Informants, from December 4, 2000, through the present.  This request includes all emails stored electronically.

(4)    From the HPD, any and all emails or other correspondence sent or received by Officers Miguel Rosario, Gerald Cormier, Sr., or Cindy Burney, concerning the murder of Deputy Hill, Mr. Will's case, and/or Michael Rosario, from December 4, 2000, through January 23, 2002.  This request includes all emails or other correspondence stored electronically.

(5)    From the HCDA, the HCSO, the HPD, and any other individual or entity acting on the State's behalf, all files, correspondence, notes, or records of any kind, whether in hard copy or electronic form, concerning Rosario, Greenlee, and/or any of the Informants, whether related to Mr. Will's case **or any other case.**  This request specifically includes, but is not limited to:

- any and all records containing the following SPN numbers:  01480405 (Mr. Will); 01492582 (Michael Rosario); 01217869 (David Cruz); 00542145 (Antonio Riojas); 01357006 (Richard Lucio); 01360186 (Rene Gonzales); 01774747 (Scott Craig); 00757571 (Victor Coronado); and 01747671 (Marshall Greenlee);

- any and all records pertaining to offenses in which Rosario, Greenlee, or any of the Informants were charged and/or convicted, including all rough notes, field notes, memoranda, other raw data, call slips, and offense reports;

- any and all Justice Information Management System ("JIMS") records (including, but not limited to, JIMS Booking Inquiries, JIMS Inmate Housing Histories, cautionary indices, and caution screen entries for Mr. Will, Rosario, Greenlee, and the Informants);

- any and all D.A. Intake Management System ("DIMS") records;

- any and all Harris County Jail records (including, but not limited to, jail cards, classification documents, housing and transfer records, transport records, Administrative Separation Review Sheets, jail visitor logs, jail phone logs,

audio recordings, video recordings, logs of daily activity while in segregation, intelligence reports, caution screen entries, gang affiliation records, gang grid information, disciplinary records, evaluations, notes, progress reports, assessments, test results, and PIN packets);

- any and all recordings of phone calls made by or to Rosario, the Informants, and/or Greenlee while they were housed in any Harris County Jail facility from December 4, 2000 through January 23, 2002;

- any and all documents or records concerning communications between Rosario, Greenlee, and/or the Informants, on the one hand, and HCSO, HCDA, or HPD personnel, on the other, from December 4, 2000 through January 23, 2002;

- any and all records generated and/or maintained by the Disruptive Groups Unit, including records of any interviews between Mr. Will, Rosario, Greenlee, and/or the Informants, on the one hand, and Deputy Strickland, Deputy Squyres, Lt. Moore, Capt. Hitchcock, and/or any other officer, on the other;

- any records which identify cases in which Rosario, Greenlee, the Informants, and/or any of their relatives (including Yvonne Greenlee and Alma Cruz) have assisted the HCDA, HCSO, or HPD in investigating or prosecuting, whether or not they were called to testify at trial, and any benefits of any kind received by Rosario, Greenlee, the Informants, and/or their relatives as a result;

- any and all recordings and/or notes made of a meeting between Rosario and HPD Officer Miguel Rosario at the Lockwood jail facility on or about December 4 or 5, 2000, or any other time, including notes made by any HCSO, HCDA, or HPD personnel concerning that meeting; and

- any and all documents or records concerning communications between any of the Informants and HCSO Deputy John Craig (the brother of Informant Scott Brandon Craig).

(6)     From the HCDA, the HCSO, the HPD, and any individual or entity acting on the

State's behalf, all correspondence, notes, or records of any kind, whether in hard

copy or electronic form, generated since the conviction of Mr. Will through the

present time concerning Mr. Will's case.  This request includes, but is not limited

to, any correspondence to or from Ms. Parsons, Ms. Nassar, or Mr. Rosenthal since

their departures from the HCDA, and any correspondence to or from Deputy

38

Strickland since his departure from the HCSO.

(7)     From the HCDA and the HCSO, all records generated between December 4, 2000, and January 23, 2002, concerning the reason(s) for the placement and/or transfer of Mr. Will, Rosario, and/or the Informants to any particular jail or cell therein, including any records indicating the individual(s) who made the placement and transfer decisions for these inmates.

(8)     From the HCSO, any and all operations manuals in effect between December 4, 2000, through January 23, 2002, including, but not limited to, the manual referenced by Ms. Parsons at a pre-trial hearing on September 11, 2001.  *See* Tr. Vol. 3 at 24.

(9)     From the HCSO, any and all written policies, manuals, and/or training materials in use between December 4, 2000, and January 23, 2002, concerning housing decisions for inmates in any of the Harris County Jail Facilities.

(10)    From the HCSO, any and all written policies, manuals, and/or training materials in use between December 4, 2000, and January 23, 2002, concerning and/or mentioning the DGU.

(11)    From the HCSO, any and all Harris County Jail inmate handbooks in effect between December 4, 2000 and January 23, 2002.

(12)    From the HCSO, any and all logs listing visitors to the Lockwood detective's bureau between December 4, 2000, and December 12, 2000, which show a visit(s) by HPD Officer Miguel Rosario and/or his wife, Marie Rosario, during that time period.

(13)    From the HCSO, a map of each Harris County Jail facility indicating the location of each numbered cell in that facility as they were numbered between December 4, 2000 and January 23, 2002.

(14)    From the HCSO and HCDA, any informant indices maintained by the HCSO and/or the HCDA between January 1, 1995 through the present.

(15)    From the HCSO, a complete copy of the National Crime Information Center ("NCIC") and Texas Crime Information Center ("TCIC") reports for Mr. Will, Rosario, and the Informants.

(16)    From the HCSO DGU, a complete copy of any and all files concerning Mr. Will, Rosario, and/or any of the Informants.  This information includes, but is not limited to:

- intelligence reports;

- classification sheets;

- records of interviews with Mr. Will, Rosario, Greenlee, the Informants, or any other inmate concerning the death of Deputy Hill;

- any information obtained from any source which directly or indirectly suggests that an individual other than Mr. Will shot Deputy Hill;

- all records provided by Deputy Strickland in response to the August 29, 2001, subpoena served on him by Mr. Will's trial counsel and referenced in his pre-trial hearing testimony, Tr. Vol. 3 at 6;

- the complete file maintained by Deputy Strickland concerning Mr. Will's case and mentioned by him at the September 11, 2001 pre-trial hearing, Tr. Vol. 3 at 9; and

- records of emails and other communications between Deputy Strickland, any other DGU deputy, and/or the HCDA between December 4, 2000 and the present.

(17)     From the DGU, a complete copy of any and all files concerning the Texas Syndicate prison gang or any member thereof obtained or generated between December 4, 2000, and January 23, 2002, which relate either directly or indirectly to Mr. Will, Rosario, any of the Informants, and/or the death of Deputy Hill.  These records include, but are not limited to, any evidence of threats by the Texas Syndicate against any inmate related to the death of Deputy Hill and/or the prosecution of Mr. Will or Rosario.

(18)     From the HCSO, complete copies of the personnel and/or human resources files for Deputies Strickland and Squyres, Lt. Moore, and Capt. Hitchcock, including, but not limited to, all disciplinary records and records of internal investigations.

(19)     From the HPD, a complete copy of the personnel and/or human resources file for Officer Miguel Rosario, including, but not limited to, all disciplinary records and records of internal investigations.

(20)     From the HCDA, HCSO, and HPD, the complete casefiles for *State v. Rosario*, Cause Nos. 862716 and 862997, in the 185th District Court of Harris County.  This request includes, but is not limited to, any records concerning Mr. Will, the murder of Deputy Hill, any assistance given to the State by Rosario in the capital murder case against Mr. Will, any benefits given to Rosario for his assistance, and any evidence related to the charging decisions made by law enforcement concerning the murder of Deputy Hill.

(21)     From the HCDA and HCSO, the complete casefile for *State v. Marshall Wayne Greenlee*, Cause No. 0865615, in the 228th District Court of Harris County.  This request includes, but is not limited to, any records concerning Mr. Will, Rosario,

the murder of Deputy Hill, any assistance given to the State by Greenlee or his wife, Yvonne Greenlee, in the capital murder case against Mr. Will, and/or any benefits given to Marshall Greenlee for his and/or Yvonne Greenlee's assistance.

(22)    From the HCDA and HCSO, the complete casefile for *State v. Rene Gonzales, Jr.*, Cause No. 0857350, in the 339th District Court of Harris County. This request includes, but is not limited to, any records concerning Mr. Will, Rosario, the murder of Deputy Hill, any assistance given to the State by Gonzales in the capital murder case against Mr. Will, and/or any benefits given to Gonzales for his assistance.

(23)    From the HCDA and HCSO, the complete casefiles for *State v. Brenda Venegas*, Cause Nos. 862714 and 1036122, in the County Criminal Court at Law No. 6 of Harris County.

(24)    From the U.S. Probation Office for the Southern District of Texas, Rosario's pre-sentence investigation report (including any PSR objections or responses filed by the government or the defense) and sentencing submissions (including any sentencing memoranda or recommendations) in *United States v. Rosario*, Cause No. 4:05-CR-00087-001.[12]

---

[12] This report, dated August 30, 2005 and filed in a federal criminal case against Rosario for being a felon in possession of a firearm, is sealed. But in his objections to the report, Rosario stated that "he cooperated with law enforcement [in the Deputy Hill murder case] and was listed as a witness for the prosecution during the eventual trial of his codefendant." *See United States v. Rosario*, Cause No. 4:05-CR-00087-001, Dkt. 35, at 5. At his federal sentencing hearing on September 6, 2005, Rosario told the Court that he pleaded guilty to a November 15, 2000, robbery that came to the authorities' attention after Deputy Hill's shooting "so I wouldn't get charged with [the] murder" of Deputy Hill. *See United States v. Rosario*, No. 4:05-CR-00087-001, Dkt. 50, at 10-12 (transcript of sentencing hearing). Rosario's attorney (who also represented Rosario in the Deputy Hill murder investigation) told the Court that Rosario agreed to testify against Mr. Will in the capital murder case, and "after his cooperation in that regard, the state did come back and voluntarily reduce that case (i.e., the November 15, 2000 robbery) to theft from a person and gave Mr. Rosario his back time and released him." *See id.* at 12. The State has never disclosed any

(25)    From the U.S. Probation Office for the Southern District of Texas, Rene Gonzales's pre-sentence investigation report (including any PSR objections or responses filed by the government or the defense) and sentencing submissions (including any sentencing memoranda or recommendations) in *United States v. Nuncio*, Cause No. 4:07-cr-00037.[13]

(26)    From the Texas Board of Pardons and Paroles, any and all records concerning Rosario, Greenlee, and/or any of the Informants, including, but not limited to, any letters written on behalf of these individuals by Lynne Parsons, Denise Nassar, or any other HCDA representative or member of law enforcement. This request also includes any records concerning the reason for a parole officer visit to Informant

---

deal given to Rosario as a result of his cooperation in the capital murder case against Mr. Will, despite the prosecutor's representation, at a September 21, 2001 pre-trial hearing, that the State would provide "all promises or benefits afforded to any prospective witnesses by the State, including, but not limited to, codefendants and/or other participants in the alleged offense in connection with their proposed testimony or other cooperation with regard to the alleged offense." *See* Tr. Vol. 4 at 2-5. Two weeks after Mr. Will was sentenced to death, Rosario pleaded guilty to two theft charges in exchange for 2 years and 14 months, respectfully, in TDCJ. *See* Dkt. 59-19 (2/7/02 Judgments in *State v. Rosario*, Cause Nos. 862716 and 862997). Mr. Will deserves an opportunity to inquire into how Rosario assisted law enforcement in Mr. Will's case and what, if any, benefits he was given for that assistance.

[13]  This report is sealed. The fact that Gonzales filed an application to subpoena Ms. Parsons and Deputy Strickland in his aggravated robbery case that was pending in the 339th District Court of Harris County in the weeks leading up to Mr. Will's capital murder trial, Dkt. 59-11, combined with the recently produced prosecutor notes of conversations with Gonzales about Mr. Will's case, Dkts. 59-9 and 82-46, indicate that Gonzales likely sought a benefit from the State in exchange for his assistance in Mr. Will's prosecution. Mr. Will deserves an opportunity to investigate whether such a benefit was given. The PSR in Gonzales's 2007 federal racketeering and murder case might also shed light on his previous assistance to law enforcement in its prosecution of Mr. Will. The recently-produced prosecutor notes state that Gonzales, a Texas Syndicate member, told Deputy Strickland that Rosario had put a hit out on Mr. Will. In the *United States v. Nuncio* case several years later, Gonzales was convicted, along with other members of the Texas Syndicate, with various crimes related to his membership in the prison gang.

Craig in the Harris County Jail in January 2002 during Mr. Will's capital murder

trial, referenced in Craig's trial testimony. *See* Tr. Vol. 30 at 228-29.

(27)   From telephone carriers active in the Houston area from December 4, 2000, through

December 11, 2000, including, but not limited to, Houston Cellular (now AT&T),

PrimeCo (now Verizon or AT&T), Cellular One, AT&T, and Verizon, records

indicating the home and mobile phone numbers used by Michael Alan Rosario,

Miguel Angel Rosario, Marie Rosario, Marshall Greenlee, Yvonne Greenlee,

Brenda Venegas, Cormier, Jr., and Cory Moore, during the period of December 4,

2000, through December 11, 2000, as well as phone records showing all calls made

to or from those phone numbers during that time period.[14]

(28)   From the Federal Bureau of Investigation, the complete casefile on Michael Alan

Rosario, FBI #811109AB3.

---

[14]   At Mr. Will's trial, a flurry of witnesses testified to various phone calls that were made immediately after the shooting of Deputy Hill—calls that show Rosario knew that an officer had been killed well before he later let on to the police.  In her written statement, Natasha Helalian stated that Brenda Venegas called her crying, saying Mr. Will was in jail and asking her to come over.  *See* Dkt. 82-25.  When Helalian got to Venegas's apartment, Rosario was there, and she heard him tell Venegas that "the blood came off 'em" when he put on his white windbreaker pants. *Id.*  Helalian also heard Rosario tell someone on the phone, "I can't say nothin' over the phone, but Robert jacked a car from a woman." *Id.*  Mrs. Rosario's call to Deputy Thomas that morning to dig for information on the murder suspects, before law enforcement even knew her son was involved, is also quite damning.  Mrs. Rosario had to have received a phone call from her son that morning right after the murder.  Marshall Greenlee told Ms. Parsons that after he encountered Cassandra Simmons in the apartment complex parking lot immediately after the shooting of Deputy Hill, he went inside his apartment and called Venegas.  *See* Dkt. 59, Audio Exhibit B (Marshall Greenlee Interview).  This flurry of phone calls between acquaintances and relatives of Mr. Will and Rosario to discuss the murder of Deputy Hill, even before law enforcement knew the identities of the suspects, is suspicious, and cries out for a deeper investigation.  Mr. Will seeks access to the requested phone records in order to learn exactly when Rosario called his mother to report the shooting, to corroborate and/or impeach the witnesses' statements regarding the timing of the various phone calls, and to prepare for depositions of these various witnesses.  This information is critical to Mr. Will's *Brady* claim.

## **CONCLUSION**

For the foregoing reasons, Mr. Will requests that this Court grant him leave, pursuant to Habeas Rule 6 and Federal Rule of Civil Procedure 45, to depose the witnesses, identified herein, whose testimony is critical to his *Brady* claim.  Mr. Will also requests that this Court authorize service of subpoenas, pursuant to Habeas Rule 6 and Federal Rule of Civil Procedure 45, for documents held by the HCDA, HCSO, HPD, and various other law enforcement agencies and witnesses, identified herein, which are necessary to establish the State's suppression of evidence that would have exculpated Mr. Will, inculpated Michael Rosario, and impeached the State's methods of investigation in this capital murder case.

Dated:  May 3, 2024                              Respectfully submitted,

                                                 */s/ Gretchen N. Scardino*
                                                 Gretchen N. Scardino
                                                 Texas Bar No. 24037170
                                                 gretchen@scardinollp.com
                                                 SCARDINO LLP
                                                 111 Congress Avenue, Suite 500
                                                 Austin, TX 78701
                                                 (512) 443-1667

                                                 Jason C. Ewart
                                                 District of Columbia Bar No. 484126
                                                 jason.ewart@arnoldporter.com
                                                 Karen C. Otto
                                                 District of Columbia Bar No. 995361
                                                 karen.otto@arnoldporter.com
                                                 ARNOLD & PORTER KAYE SCHOLER LLP
                                                 601 Massachusetts Avenue, NW
                                                 Washington, DC 20001
                                                 (202) 942-5000

                                                 Samy Khalil
                                                 Texas Bar No. 24038997
                                                 samy@klfirm.law
                                                 KHALIL &LAKE
                                                 4200 Montrose Boulevard, Suite 440
                                                 Houston, TX 77006
                                                 (713) 904-4477

Chad Flores
Texas Bar No. 24059759
cf@chadfloreslaw.com
FLORES LAW PLLC
917 Franklin Street, Sixth Floor
Houston, Texas 77007
(713) 893-9444

Adam Dinnell
Texas Bar No. 24055405
adinnell@shjlawfirm.com
SCHIFFER HICKS JOHNSON PLLC
700 Louisiana Street, Suite 2650
Houston, TX  77002
(713) 357-5150

*ATTORNEYS FOR PETITIONER*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of May, 2024, a copy of the foregoing *Petitioner's Amended Omnibus Motion for Leave to Conduct Discovery, Including Depositions* was served via ECF filing on Ali M. Nasser, Assistant Attorney General, Criminal Appeals Division of the Texas Attorney General's Office, at P.O. Box 12548, Capitol Station, Austin, Texas, 78711.

*/s/ Gretchen N. Scardino*
Gretchen N. Scardino